(No. 33933.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* SAMUEL BYBEE, JR., Plaintiff in Error.

*Opinion filed September 25, 1956.*

Paul E. Thurlow, of Joliet, for plaintiff in error.

Latham Castle, Attorney General, of Springfield, and William H. Small, State's Attorney, of Galesburg, (Fred

G. LEACH, and EDWIN A. STRUGALA, of counsel,) for the People.

Mr. JUSTICE DAILY delivered the opinion of the court:

Under an indictment returned to the circuit court of Knox County, Samuel Bybee, Jr., hereinafter referred to as the defendant, was charged, in counts I and IV thereof, with the crime of statutory rape, in count II with the crime of rape by force, and in count III with having taken indecent liberties with a minor. At the jury trial which followed on June 23, 1954, a verdict was rendered finding the defendant guilty of statutory rape under the first count of the indictment and fixing his punishment at 40 years in the penitentiary. After the defendant's motions in arrest of judgment and for a new trial were overruled, judgment and sentence were entered in accordance with the jury's determination. Writ of error has now been prosecuted to this court.

The People's evidence indicates that on the morning of November 21, 1953, as the complaining witness was walking to her place of employment, she was approached by the 26-year-old, married defendant, who invited her to ride with him in his automobile to visit a mutual friend. The girl agreed, and, after receiving her employer's permission, she entered the automobile for this purpose, but instead of driving to his promised destination, the defendant drove to a neighboring public park area, known as Lake Storey, where the criminal act was committed.

The fourteen-year-old complaining witness testified that she customarily worked each Saturday at the residence of Dr. Jackson Erffmeyer, in Galesburg, Illinois, and that on the morning in question she left for work at approximately 8:24 A.M., rode a bus to within a short distance of the Erffmeyer residence, and then started walking to her place of employment, when a light blue, four-door automobile honked and pulled to the curb. She stated that Bybee,

whom she then knew as Bob Baker, was driving, and that after some conversation he suggested they ride to a nearby drive-in restaurant to see Felicia Hunt, a mutual friend. According to the witness, she looked at her watch and noticed the time was 8:45 A.M., and since she was to be at work not later than 9:00 A.M., she told Bybee she would have to get her employer's permission and thereupon went to the door of the Erffmeyer home and asked Mrs. Erffmeyer if she could be a few minutes late. After receiving consent, she entered the automobile with the defendant and proceeded toward the restaurant, but instead of stopping, the defendant continued until he entered the Lake Storey area. The complaining witness then described how Bybee tried to remove her clothing, how she first resisted, but later submitted to his advances because of threats and exhaustion. Thereafter, she continued, the defendant drove her back to her place of employment where she told Mrs. Erffmeyer what had happened. She also stated that she was later taken by her mother to the office of Dr. Erffmeyer for an examination and to the State's Attorney's office; that she identified the defendant from a police photograph and later from a group of four individuals at police headquarters; and that on the date of the offense, Bybee was wearing levis, engineering boots, a green leather baseball cap, and a brown, fur-collared jacket.

This account was corroborated, at least in part, by the testimony of the employer, Elizabeth Erffmeyer. She stated that on the morning of the alleged attack, the prosecutrix knocked at her door at approximately 8:45 A.M. and received her permission to be late for work in order to meet Felicia, and that she then noticed a blue, four-door automobile, with a noisy muffler, pull away from the curb. According to the witness, prosecutrix returned to the house at approximately 9:25 A.M. and advised her of the preceding events.

Dr. Jackson Erffmeyer then testified that he saw the

prosecutrix at his office at 10:45 A.M. on the morning in question and that an examination by him disclosed a vaginal tear, a small amount of bright red blood, and the presence of live spermatozoa. On cross-examination, however, he admitted that it would have been possible for the act of intercourse to have occurred some ten hours prior to the time of the examination.

William Allison, a Galesburg policeman, stated that he saw defendant on November 25, 1953, and that on this occasion, he was wearing heavy-type work shoes, a green leather billed cap, and a fur-collared jacket, and that he was driving a light blue, four-door, 1951 Dodge automobile.

Another police officer, Al Rowe, testified that he had, without success, on prior occasions, shown certain photographs to the complaining witness in order to establish the true identity of the man she knew only as Bob Baker, and that on November 25, she identified Bybee's photograph as that of her assailant. He also told how he and two deputy sheriffs apprehended the defendant on November 27, 1953, and stated that at the time of his arrest, Bybee was wearing levis and three-quarter length shoes, and was driving a blue 1950 or 1951 Dodge four-door sedan. Max Jones, one of the deputy sheriffs referred to by Rowe, recalled that Bybee was wearing a brown, fur-collared jacket and logger boots, and was driving a late model, blue Dodge which had a defective muffler. A similar description was given by Edwin Watkins, the other arresting deputy sheriff.

The last to testify for the People was the mother of the complaining witness. She stated that her daughter left home for work on the morning of November 21, but returned before 10 A.M. and told her of the rape. The mother also testified that on December 9, 1953, the defendant came to her place of business and admitted the rape, but threatened to smear the daughter's name unless the prosecution was dropped, whereupon the mother called the police and had him evicted from the premises.

Bybee's defense was an alibi, and in support thereof, he produced several witnesses who saw him at various times during the morning of November 21. Two witnesses testified that they saw the defendant at a restaurant around 8:15 A.M.; two others placed him at a service station in Knoxville, a neighboring town, at approximately 8:20 A.M., and a Galesburg storekeeper said he was in his place of business between 8:20 A.M. and 8:40 A.M. on the morning in question. Daniel Parrish and his mother both testified that the defendant was at their home sometime between 9:00 A.M. and 9:30 A.M., but on cross-examination they both admitted that they were not sure of the time but were merely basing it on the time of day that various things were customarily done around the household, such as the father leaving for work and the son's eating breakfast.

Max Hillman, an ordained minister and tree surgeon, testified that his hired lady ordinarily came to work at 9:00 A.M. and that soon after she arrived on the morning in question, Bybee telephoned and wanted to borrow some tools. Thereafter, according to Hillman, the defendant came to his home for the tools, arriving between 9:30 A.M. and 9:35 A.M. On cross-examination, the witness admitted that he had talked to a police officer soon after Bybee's arrest but could not remember whether he had then said that the defendant arrived at his home some thirty minutes later than his testimony indicated. Nevertheless, the People's rebuttal witness, William Allison, testified that he talked with Hillman on December 2, 1953, and was told on that occasion that Bybee did not arrive at the Hillman residence until after 10:00 A.M.

Nellie James testified that she also received a telephone call from the defendant on the morning of the assault, in this case between 9:00 A.M. and 9:30 A.M. However, on cross-examination she admitted that she did not remember the exact time but that the call could have been received as late as 10 o'clock. Her husband, Omer James, stated

that he saw the defendant at approximately 10:30 A.M. on this particular forenoon.

Samuel Bybee, Jr., then testified in his own behalf that he had met the complaining witness on at least one occasion prior to November 21, 1953, but did not remember whether he then gave her his true name or whether he told her that his name was Bob Baker. Bybee admitted that he owned a blue four-door 1951 Dodge automobile and that on the day of the alleged crime, he wore blue jean overalls, high top boots, a green leather billed cap, and a fur-collared jacket, but emphatically denied that he had either seen the prosecutrix on the day in question, or that he had ever taken indecent liberties or had sexual intercourse with her. According to his testimony, the defendant arrived at the Hobby Grill restaurant about 8:15 A.M. on the morning of November 21, 1953, and then proceeded directly to the Knoxville service station where he stayed until between 8:30 and 8:35. Thereafter, he drove his automobile to Galesburg and entered a leather shop about 8:50 A.M., leaving at approximately 9:00 o'clock. After exchanging a few remarks with an acquaintance at a nearby lunch counter, Bybee then drove to a Galesburg service station and telephoned both Max Hillman and Nellie James between 9:05 and 9:15 o'clock. Thereafter, continued the defendant, he motored to the Parrish residence for a ten minute visit commencing at approximately 9:20 A.M., after which he proceeded to the Hillman home, arriving at about 9:35. Finally, Bybee said that he was in the company of Max Hillman until after 10:00 A.M., at which time he drove to the Omer James residence where he was employed for the balance of the day. Although admitting that he visited the mother of the complaining witness on December 9, Bybee denied that he at any time confessed his guilt but said that his sole purpose in talking with her was to see why he had been "picked on."

The defendant now contends (1) that the verdict of

the jury was against the law and the evidence and that the lower court erred in overruling his motion for a directed verdict, (2) that there was no proof that the offense had been committeed in Knox County, (3) that a variance or inconsistency existed in the verdict itself, and (4) that the trial court erred in giving certain instructions for the State and in refusing others which were offered by the defense. However, contrary to Supreme Court Rule 38, (Ill. Rev. Stat. 1955, chap. 110, par. 101.38,) the defendant, in support of his fourth contention, has included in his abstract of record only those instructions of which he complained without regard to others which were both given and refused. Since the suitability of a particular instruction can best be judged by considering it in connection with all the other instructions which were given in the specific case, (*People* v. *Wilson*, 1 Ill.2d 178; *People* v. *Shelton*, 388 Ill. 56; *People* v. *DeRosa*, 378 Ill. 557; *People* v. *Shader*, 326 Ill. 145; *City of Roodhouse* v. *Christian*, 158 Ill. 137,) and since this court is not bound to search the record itself to supply abstract deficiencies, (*People* v. *Mattei*, 381 Ill. 21; *Clinton* v. *Drainage Commissioners*, 341 Ill. 135,) we have repeatedly held that error cannot be predicated upon the giving, refusal, or modification of certain instructions unless all instructions which were given and tendered are completely set forth in the abstract. (*People* v. *Husband*, 4 Ill.2d 451; *People* v. *Tabet*, 402 Ill. 93; *People* v. *Gawlick*, 350 Ill. 359; *People* v. *Weil*, 243 Ill. 208.) In view of the fact the defendant has failed to satisfy this requirement, we will not now inquire whether the trial court erred in this respect but will limit our considerations to the other assignments of error.

The rule is that a verdict rendered in a criminal case will be disturbed only where it is so improbable as to raise a reasonable doubt of the defendant's guilt. (*People* v. *Quevreaux*, 407 Ill. 176; *People* v. *Fisher*, 303 Ill. 594; *People* v. *Allen*, 413 Ill. 69.) Here, Bybee was posi-

tively identified by the complaining witness, his automobile matched the description given by both the victim and her employer, the clothing he admitted wearing on the date of the crime was identical to that worn by the attacker, he had previously known the victim but could not remember whether he used the name "Bob Baker," and medical testimony showed the girl had in fact been sexually molested. On the other hand, the only contrary evidence was his own denial and the alibi testimony which covered the period from 8:45 A.M. to 9:25 o'clock, the time of the alleged crime. Daniel Parrish and his mother testified that they may have seen Bybee as late as 9:30 A.M. Max Hillman, another alibi witness, stated that he received a call from the defendant soon after his hired lady arrived for work, which was customarily about 9:00 A.M. but did not actually see Bybee until at least 9:30, and according to evidence of his previous inconsistent statement, perhaps as late as 10:00 A.M. The only other person to testify concerning Bybee's whereabouts during the period of the alleged assault was Nellie James, who first said she received a call from Bybee between 9:00 and 9:30 A.M. and then later said it could have been about 10 o'clock. The evidence as to an alibi is somewhat conflicting, and it cannot be said to raise such a reasonable doubt of guilt as to warrant the setting aside of the jury verdict. In so deciding, we are not unmindful of the argument made by counsel for the defense in his brief to this court that certain evidence for the prosecution was improperly admitted. However, these points were neither raised in his motion for a new trial nor in his assignment of errors to this court, and are therefore waived. (*People* v. *Reck,* 392 Ill. 311; *People* v. *Mattei,* 381 Ill. 21; *People* v. *Dron,* 360 Ill. 309; *People* v. *Hotchkiss,* 347 Ill. 217.) It is our opinion that the verdict of the jury was not against the law and the evidence and that the lower court did not err in overruling the defendant's motion for a directed verdict.

Next, the defense contends that proper venue was not proved. The record indicates that the prosecutrix, after having testified the criminal act was committed in Knox County, was cross-examined upon the following particulars:

"Q. Do you know where the Warren County line is, * * *?

A. No.

Q. Are you able to tell whether or not the place where you stopped the second time is in Knox County or Warren County?

A. It's in Knox.

Q. How do you know that, * * *?

A. Because the county line goes on quite a bit further than where we were.

Q. Didn't you just testify that you didn't know where the Warren County line was?

A. Yes.

Q. But you now know that the Warren County line goes much further than where you were?

A. Yes, but I don't know where it's at."

The defendant argues that because this witness did not know where the county line was, and since no other evidence of venue was offered, the State failed to sustain this material allegation. With this we cannot agree. It is not at all contradictory for an individual to know that he is in a particular county, city, or State without being able to accurately define the geographical boundaries. Here, the complaining witness categorically testified that the crime was committed in Knox County, and although she was uncertain as to that county's territorial limits, we believe that her testimony upon this point was sufficient to prove venue as alleged.

Finally, the defendant contends that since count I and count IV of the indictment were practically identical, a finding of guilt only as to the former implied an acquittal of the latter, and thus, a variance or inconsistency existed

in the verdict itself. Although this argument is indeed novel, we find it to be without merit. It is true that where different counts charge separate and distinct crimes, a conviction upon only one count is equivalent to an acquittal of the others, (*People* v. *Potts*, 403 Ill. 398; *People* v. *Weil*, 243 Ill. 208,) but we know of no instance in which this court has extended the principle to counts charging the same crime. In fact, to do so would be an absurdity. We would in effect be saying that the inference of acquittal arising from the jury's silence was strong enough to overcome its express contrary finding. Such, of course, does not meet the test of common sense. The more reasonable explanation is, that having found the defendant guilty under count I, and realizing that count IV was identical, the jury did not deem it necessary to indulge in specific repetition, and since defendant was in no way prejudiced by this omission, he has no grounds for complaint.

It is our opinion that the defendant in this case received the fair and impartial trial to which he was entitled, and although the sentence was indeed severe, it was not excessive. (*People* v. *Laughery*, 396 Ill. 213.) The judgment of the circuit court of Knox County is, therefore, affirmed.

*Judgment affirmed.*