(No. 56144.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT BYRON *et al.* (Robert Byron, Appellant).

*Opinion filed February 20, 1987.—Rehearing denied March 30, 1987.*

84

MORAN, J., dissenting.

Frederick F. Cohn and Dennis M. Doherty, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Thomas V. Gainer, Jr., and Robert A. Alvarado, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GOLDENHERSH delivered the opinion of the court:

An indictment returned in the circuit court of Cook County charged Robert Byron (hereafter defendant), Harold Bean, Ann Walters, and Wayne Walters, with the

murder of Dorothy Polulach (three counts, Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)), armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2), home invasion (Ill. Rev. Stat. 1979, ch. 38, par. 12—11(a)(2)), and conspiracy (Ill. Rev. Stat. 1979, ch. 38, par. 8—2(a)). Bean was also charged with solicitation. For reasons not relevant here, the Walters were granted a severance. The circuit court denied defendant's pretrial motion for severance, and thereafter in a jury trial Bean and defendant were found guilty of each of the offenses charged. In a hearing requested by the People, the jury found that there existed one or more factors set forth in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)) and that there were no mitigating factors sufficient to preclude a sentence of death. Bean and defendant were sentenced to death, and their sentences were stayed (87 Ill. 2d R. 609(a)) pending appeal to this court (Ill. Const. 1970, art. VI, sec. 4(b); 103 Ill. 2d R. 603). Because of the denial of his oral motion for severance, Bean's conviction was reversed. *People v. Bean* (1985), 109 Ill. 2d 80.

Defendant's contention that his conviction must be reversed because the People failed to prove his guilt beyond a reasonable doubt requires that we briefly review the evidence. Many of the facts are stated in *People v. Bean* and will be supplemented here only to the extent necessary to discuss the issue. The People's principal witnesses were Wayne Walters, Robert Daniel Egan, and Debra Youngbrandt. Walters testified that the charges against him were to be reduced in exchange for his cooperating with the People. During 1979, he and his wife, Ann Polulach Walters, resided in Fort Lauderdale, Florida. Ann's mother, Gracie Polulach, who was divorced from Ann's father George, lived with them. George lived in Chicago with his wife Dorothy, the deceased, whom Ann hated, often referring to her as the "black widow."

Ann blamed Dorothy for George's suicide in December 1979.

The night after George's wake in Chicago, the Walters, Bean, and Geri Smith, who was Bean's former wife and a friend of Ann's, were gathered at Smith's home in Chicago. Ann expressed her suspicions that Dorothy was in some way responsible for George's death. Bean suggested that, for money, he would kill Dorothy. In May 1980, Smith and Bean visited the Walters at their home in Florida, and the killing of Dorothy was discussed again. In June 1980, at the Walters' request, Bean traveled to Florida to discuss his suggestion that he would kill Dorothy. The Walters gave Bean $2,500 in cash for expenses.

Robert Daniel Egan, charged with the offense of armed violence for conduct at the Polulach home at the time of the homicide, admittedly cooperating with the People in exchange for a reduced sentence, testified that in February 1981 he discussed with Bean and defendant a possible killing for money. Defendant was Egan's ex-brother-in-law. After this discussion, which took place in defendant's home, Egan, Bean, and defendant left defendant's home in Bean's car to burglarize the Polulach home. As a disguise, Bean wore a priest's cassock and was carrying a briefcase. At approximately 6:45 p.m., Egan dropped Bean and defendant off a few blocks from the Polulach home, and, pursuant to Bean's direction, drove to a nearby roller-skating rink and waited. Later, defendant appeared and removed a gun hidden underneath the front seat of Bean's car, explaining that they forgot the gun and might need it. Defendant told Egan that 15 minutes later he was to drive down the street. Defendant left, and after waiting 15 minutes Egan started down the street as instructed. He picked up Bean and defendant, who were walking. The three returned to defendant's home, where they sorted out jew-

elry which defendant had removed from the briefcase which Bean had been carrying. The three then left defendant's home and drove to a bridge over the Cal-Sag River where Bean left the car and threw the gun into the water. Despite repeated efforts, this gun was never found. The next day defendant, Egan, and Bean drove to an alley behind a restaurant and Bean disposed of the priest's clothing.

Wayne Walters testified that Bean returned to Florida on February 18, 1981. He told the Walters that he had killed Dorothy and described to them how the murder occurred. He said he needed $10,000 immediately in order to pay off his two "partners," one of whom had helped him in the Polulach home while the other had waited in the car. In response to Bean's request for payment, Wayne gave Bean $50.

Egan testified further that, when Bean returned to Chicago, Egan and defendant picked Bean up at the airport. On the way to the airport, at defendant's request, Egan threw a bag of costume jewelry into a river. On the return trip from the airport, Bean told Egan: "You can add another round to our bag of tricks. *** Murder." In defendant's presence, Bean then related how he entered the Polulach home, fought with Dorothy, and slapped her. After she fell down, he handcuffed her hands behind her back and handcuffed her legs together. He then shot her twice in the head.

Walters testified further that Bean returned to Florida at the Walters' expense in March 1981. Because she was "terrified" that Bean's partners might injure her if she did not pay them, Ann borrowed $5,000 from two friends. Wayne gave this money to Bean, and Bean indicated that the money would "keep them [his partners] quiet" and that they "won't hurt you *** because they know they have me to deal with and I would kill them."

After Dorothy's body was discovered by a friend, upon being interrogated, the Walters confessed their participation in the crime.

Defendant was taken into custody on April 6, 1981, at his home. Detective Duffin testified that, when questioned at the police station, defendant replied that he had just "shot up" with heroin, and upon investigation, needle marks were found on defendant's body. No charges were filed and defendant was released.

Debra Youngbrandt, Bean's girlfriend, testified that after hearing of defendant's April 6 arrest, she, Bean, and Egan fled Chicago in her automobile and drove west through Illinois, Iowa, and Nebraska. During the trip, Bean indicated that he was the "priest" who had killed Dorothy Polulach. When Egan was arrested in Holdridge, Nebraska, for a minor traffic violation, Bean and Youngbrandt left Egan at the police station and returned to Chicago. On the way back, they abandoned Youngbrandt's car and stole a pickup truck to which Bean attached stolen license plates. Upon their return to Chicago, at Bean's request Youngbrandt called defendant in order to set up a meeting between the two men. However, the next day while at a truck stop, Youngbrandt called the authorities and eventually gave a statement implicating Bean.

Egan was arrested at defendant's home on April 22. Defendant was arrested the next day, immediately after his appearance before a grand jury investigating the murder. In response to eight of the 14 questions asked him before the grand jury, defendant refused to answer upon assertion of his fifth amendment rights. Bean was arrested two days after defendant's arrest.

At trial, defendant presented an alibi. William and Lorraine Maloney, friends of defendant's mother, testified that defendant had been at the Maloney home from approximately 11:30 a.m. until 7 p.m. on the day of the

murder. Defendant's testimony was consistent with that of the Maloneys. It was defendant's theory that Egan and Bean committed the crime, and Egan, when cornered, in order to receive a more lenient sentence for himself, falsely implicated defendant.

Prior to trial, defendant, in a written motion for severance, stated that the evidence which was to be introduced at trial overwhelmingly implicated Bean, but not defendant. Defendant argued that introduction of this evidence would be highly prejudicial to his defense. Bean's attorney orally joined this motion, which the circuit court denied.

Defendant contends that only Egan's testimony linked him to the crime. He argues that because Egan was an admitted participant in the crime, had been convicted of four felonies, and had testified against defendant pursuant to an agreement with the People that he would receive a reduced sentence, his testimony was insufficient to prove defendant guilty beyond a reasonable doubt. We do not agree. Notwithstanding that the jury was informed of the infirmities in Egan's testimony and instructed that his testimony was to be viewed with suspicion, it found defendant guilty. We find apposite the statement in *People v. Collins* (1985), 106 Ill. 2d 237, wherein the court, in rejecting contentions similar to those made here, said:

"A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. (*People v. Vriner* (1978), 74 Ill. 2d 329, 342; *People v. Manion* (1977), 67 Ill. 2d 564, 578; *People v. Bybee* (1956), 9 Ill. 2d 214, 221.) Although the testimony of an accomplice is viewed with suspicion (*People v. Baynes* (1981), 88 Ill. 2d 225, 232; *People v. Todaro* (1958), 14 Ill. 2d 594, 602), we have repeatedly held that it is sufficient to sustain a conviction if it satisfies the jury of the defendant's guilt beyond a reasonable doubt (*People v. Farnsley* (1973), 53 Ill.

2d 537, 544-45; *People v. Coleman* (1971), 49 Ill. 2d 565, 573; *People v. Wollenberg* (1967), 37 Ill. 2d 480, 484-85; *People v. Hansen* (1963), 28 Ill. 2d 322, 332-33). When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the defendant. As the United States Supreme Court observed in *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' The court went on to note that, '[o]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' (Emphasis in original.) 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

In view of these principles, we conclude that there is sufficient evidence to support the jury's verdict. Stated simply, the resolution of the defendants' guilt or innocence depended on the credibility of the witnesses and the weight given their testimony. It is well settled that these determinations are exclusively within the province of the jury. (*People v. Ellis* (1978), 74 Ill. 2d 489, 496; *People v. Manion* (1977), 67 Ill. 2d 564, 578; *People v. Zuniga* (1973), 53 Ill. 2d 550, 559; *People v. Soukup* (1968), 41 Ill. 2d 94, 97.) Similarly, it is for the jury to resolve any conflicts in the evidence. (*People v. Kubat* (1983), 94 Ill. 2d 437, 468; *People v. Vriner* (1978), 74 Ill. 2d 329, 342.) Here the jury was fully cognizant of the infirmities in [Egan's] testimony and was instructed that his testimony was to be viewed with suspicion. Nevertheless, the jury chose to believe [Egan] over the defense witnesses, and after reviewing the record, we are not prepared to say that their conclusion was unreasonable." 106 Ill. 2d 237, 261-62.

Defendant contends next that in denying his motion for severance the circuit court committed reversible er-

ror. He argues that, where the defenses of codefendants are antagonistic and incompatible, a severance is required in order to ensure each defendant a fair trial. (*People v. Johnson* (1958), 13 Ill. 2d 619; *People v. Meisenhelter* (1942), 381 Ill. 378.) Where one defendant accuses his codefendant, an antagonism arises which requires separate trials; otherwise, the alternative is a "circus." *People v. Braune* (1936), 363 Ill. 551.

Defendant contends further that the circuit court erred in denying the motion because he was "overwhelmed" by the abundance of evidence that was presented as to Bean only. Citing *United States v. Sampol* (D.C. Cir. 1980), 636 F.2d 621, 647, he argues that such a severe disparity in proofs required the ordering of a severance.

The People contend that it was not error to deny a severance because defendant received a fair trial. They argue that defendant failed to prove that his alibi defense was antagonistic to Bean's defense, or that he was "overwhelmed" by the perceived overabundance of evidence introduced solely against Bean. They argue further that because defendant, in his pretrial motion for severance, failed to state specifically how defendant would be prejudiced by proceeding with the joint trial and alleged mere apprehensions of prejudice, his demand for a severance must fail.

The People argue, too, that both defendants' defenses were compatible because they did not reciprocally accuse each other of the murder; specifically, the People point out that whereas defendant accused Bean, Bean did not testify and charge that defendant was the perpetrator of the offense. Finally, the People contend that the conflict in defenses which defendant contends exists is not a "true conflict" rising to the level of prejudicial antagonism; that the assertion by one defendant of an alibi defense does not automatically create antagonism as a

matter of law; that antagonism between defenses exists only where one or more codefendants testify and implicate others; and that this court has never held that an "overwhelming abundance" of evidence presented against one defendant may prejudice his codefendant.

The long-established rule in this jurisdiction is that "defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice." (*People v. Lee* (1981), 87 Ill. 2d 182, 187.) There is no automatic right to be tried separately from one's codefendants. (*People v. Bean* (1985), 109 Ill. 2d 80, 92.) A defendant's pretrial motion for severance must demonstrate specifically the prejudice complained of; mere apprehensions of prejudice are insufficient. (*People v. Bean* (1985), 109 Ill. 2d 80, 92; *People v. Lee* (1981), 87 Ill. 2d 182, 186; *People v. Yonder* (1969), 44 Ill. 2d 376, 386.) The decision to grant a severance is within the sound discretion of the circuit court and will not be reversed absent an abuse of that discretion. (*People v. Bean* (1985), 109 Ill. 2d 80, 93; *People v. Daugherty* (1984), 102 Ill. 2d 533, 541.) Severance is required where the defenses of codefendants are so antagonistic that severance is imperative to insure a fair trial. *People v. Bean* (1985), 109 Ill. 2d 80, 93; *People v. Daugherty* (1984), 102 Ill. 2d 533, 541-42; *People v. Lee* (1981), 87 Ill. 2d 182, 188.

We do not agree with the People that Bean's defense was not antagonistic to defendant's. In reversing Bean's conviction, we stated:

"*** Byron's defense was clearly entirely antagonistic to Bean's. In a word, Byron's defense consisted of the contention that Bean was the murderer and Byron was not even there. Byron's counsel elicited admissions from witnesses which implicated Bean and were totally irrelevant to Byron. Finally, Byron's closing argument labeled Bean as the murderer." *People v. Bean* (1985), 109 Ill. 2d 80, 96.

Much of the testimony of Walters and Youngbrandt, while directly implicating Bean, had nothing to do with defendant. The trial became more of a contest between the two defendants than between the People and each defendant; the record is replete with instances in which defense counsel attacked each other's clients, as well as each other, and only a severance could have provided defendant a fair trial. *People v. Bean* (1985), 109 Ill. 2d 80, 94; *People v. Braune* (1936), 363 Ill. 551, 556-57.

We have considered the People's argument that, although defendant's attacks on Bean were prejudicial to him, nothing Bean did here served to prejudice defendant. As we stated in *Bean*, "*any* set of circumstances which deprives *a* defendant of a fair trial is sufficient to require severance. There is no requirement that the prejudice must be symmetrical." (Emphasis in original.) (*People v. Bean* (1985), 109 Ill. 2d 80, 95.) We agree with defendant that the overwhelming volume of evidence presented against Bean only may have misled the jurors. The Federal courts have recognized that disparity in "the quantity and type of evidence adduced against the co-defendants[ ] is a vital consideration in evaluating the necessity for severance." *United States v. Sampol* (D.C. Cir. 1980), 636 F.2d 621, 646.

> "In such cases when there is a gross disparity in the quantity and venality of the testimony against the respective joint defendants it is fair to inquire 'whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in the light of its volume and limited admissibility.' [Citations.]" (636 F.2d 621, 647.)

Here, an overwhelming volume of evidence was presented as to Bean only, and in view of the bitter antagonism we are unable to say that the jurors could fairly apply the evidence to the respective defendants.

Under the circumstances shown, defendant did not receive a fair trial. The motion for severance should have been allowed, and the judgment must be reversed and the cause remanded for a new trial.

Defendant has briefed and argued a number of issues, but in view of our decision and the unlikelihood that the alleged errors will reoccur, we need not consider them.

For the reasons stated, the judgment of the circuit court of Cook County is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

JUSTICE MORAN, dissenting:

Although I agree with the majority that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt, I cannot agree with the majority's treatment of the severance issue. Therefore I respectfully dissent.

In *People v. Bean* (1985), 109 Ill. 2d 80, this court held that it was error to deny a severance of Bean's trial from that of Byron, the defendant herein. Based upon this error we reversed Bean's conviction and ordered a new trial. The reversal of Bean's conviction, however, does not by itself require a new trial for Byron. The question before this court is not whether severance was required. The question, instead, is whether the erroneous failure to sever was sufficiently prejudicial to Byron to deprive him of a fair trial.

Bean was prejudiced by the failure to sever because Byron took the position that Bean was the murderer. Bean was thus required to defend himself against both the State and his codefendant. However, Byron's motion for severance did not even allege that he expected Bean to point the finger at him, and at trial it was never Bean's position that Byron was the murderer. Byron's severance motion instead relied upon two grounds which

have heretofore never been recognized by this court as sufficient for severance: (1) the difficulty in accusing Bean as the murderer when Bean is a codefendant, and (2) the disparity in the weight of evidence against Bean as opposed to defendant.

As to the first ground above, defendant's severance motion did not state any specific way in which he would be hampered in his attempts to attack Bean. "Mere apprehensions of prejudice" are not enough to require severance (*People v. Lee* (1981), 87 Ill. 2d 182, 186), and thus the failure to spell out the prejudice anticipated would normally be fatal to defendant's motion. Moreover, given the fact that Bean was convicted of murder, it is hard to see how defendant can claim that he was prejudiced by an inability to convince the jury that Bean was the murderer.

As to the second ground, this court has never before ruled that the failure to sever may deprive a defendant of a fair trial solely because the weight of the evidence was stronger against a codefendant. The evidence is never identical as to all codefendants, and absent some specific prejudice, the court should be unwilling to require severance merely because there is evidence against one defendant which does not bear on the guilt of the other.

The case relied upon by the majority, *United States v. Sampol* (D.C. Cir. 1980), 636 F.2d 621, is factually very different from the case at bar. In *Sampol* two codefendants were charged with conspiracy and murder arising out of the car bombing of a former ambassador. A third defendant, Ignacio Nova, was charged only with making false statements to a grand jury and concealing the felony but was not charged with any culpability in the murder itself. The court held that Nova was prejudiced by a joint trial where the overwhelming bulk of the evidence bore no relevance to the relatively minor charges against

Nova but instead related almost exclusively to the more serious charges against the other two defendants. In such an extreme situation where the trial of one defendant on serious charges may confuse the jury as to the minor charges against another defendant there may be some rationale for requiring severance. However, in the case at bar the defendants were both charged with the identical crime, and witnesses implicated each of them in the murder. Defendant was not deprived of a fair trial merely because, as the majority seems to think, the witnesses against Bean were more credible than the one key witness against defendant. I would therefore affirm defendant's conviction.