THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LEONARD BEDELL, Defendant-Appellant.

First District (6th Division)   Nos. 1—92—2143, 1—92—2433,
1—92—2434 cons.

Opinion filed September 3, 1993.

David T. Cherney, of Stein & Cherney, Ltd., of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Katherine S.W. Schweit, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Following a bench trial, defendant, Leonard Bedell, was found guilty along with his codefendant, Leland Mohammed, of delivery of a controlled substance in violation of section 401 of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1987, ch. 56½, par. 1401). (Mohammed's conviction is not at issue in this appeal.) In addition to sentencing defendant to a prison term of eight years for unlawful delivery, the trial court terminated as unsatisfactory the term of probation defendant was serving on two previous drug convictions and sentenced him to two additional eight-year prison terms, to be served concurrently with the present sentence for unlawful delivery. Defendant appeals, contending that: (1) the trial court erred in denying his motion for severance; (2) he was not proved guilty beyond a reasonable doubt; and (3) the trial court violated his right to due process by depriving him of a fair and impartial trial and by revoking his probation when there was no petition for violation of probation pending.

On January 2, 1990, defendant was arrested for the subject offense. The State subsequently filed a petition for violation of probation. On January 30, 1990, the petition was dismissed and defendant was recommitted to probation following a preliminary hearing which resulted in a finding of no probable cause. In February 1990, the grand jury returned an indictment on the present charge. A trial was subsequently conducted on April 10, 1992.

Prior to trial, defendant filed a motion to sever his trial from that of Mohammed. Defendant argued that statements made by Mohammed to an undercover officer implicated him in the charged offense and placed their defenses in conflict. The trial judge asked defense counsel whether the statements at issue were oral or written, and when defense counsel responded, "oral," the judge stated, "All right. Your motion for severance is denied. I can deal with oral [statements]."

Defendant also presented a motion to quash his arrest and suppress evidence. The trial court agreed with defense counsel's recommendation that the evidence on the motion be heard and considered by the trial court simultaneously with the trial evidence.

The State first called Steven Franczyk, a United States postal inspector. On January 2, 1990, Franczyk was working as an undercover investigator in the narcotics unit. At 12:33 p.m., he met with Mohammed in the vicinity of 126th and Harvard in Chicago. Mohammed was a letter carrier for the United States Postal Service. Franczyk testified that he and Mohammed had previously arranged for Mohammed to sell him some narcotics, and they met at that location to discuss how Mohammed would be paid in exchange for the narcotics. The trial court stated that the conversation between Franczyk and Mohammed would apply only to Mohammed.

Mohammed told Franczyk that he had to call his "source" and that he would meet the source at the Walgreen's store located in the vicinity of 127th and Halsted, where Franczyk had met Mohammed in the past. Franczyk spoke with Mohammed the evening before on the telephone, and Mohammed told him that he had recently purchased narcotics from his source, and the source currently had cocaine in his possession. Mohammed told Franczyk that he would sell him a quarter ounce of cocaine for $275. The trial judge indicated that this conversation also would apply only to Mohammed.

Mohammed instructed Franczyk to wait for him at the intersection of 124th and Harvard. Mohammed was going to pick up the cocaine and return to that location to deliver it to Franczyk. Franczyk kept in contact with a surveillance team comprised of postal inspectors and Chicago police officers. Members of the team were situated in different locations, including the Walgreen's parking lot. Franczyk maintained contact with them via two-way police radios. He also wore an open microphone, which enabled units in his immediate area to monitor his conversations.

Franczyk proceeded to 124th and Harvard. He radioed to the units situated near Walgreen's that he had given Mohammed $280 in prerecorded funds, and that Mohammed had gone to meet his source in the Walgreen's parking lot.

Mohammed returned to 124th and Harvard at 1:13 p.m. He pulled over to the curb, and Franczyk exited his vehicle and stood outside Mohammed's mail truck. Mohammed handed Franczyk a clear plastic bag containing a ball of white powder along with $5 in change from the $280 Franczyk had given him. Franczyk then signaled to postal inspectors, who arrested Mohammed.

Franczyk testified that he used his two-way radio to inform the surveillance units that Mohammed, immediately after his arrest, stated that he received the cocaine from "Doc," an individual in a brown Chevy. Defense counsel objected to the admission of this statement, but the trial court allowed it in, stating that it applied only to Mohammed for purposes of the trial and to defendant only for purposes of his motion.

Mohammed was taken to the main post office, where $20 of the prerecorded currency was recovered along with another $15. Franczyk identified the cocaine he had purchased from Mohammed.

On cross-examination, defense counsel informed the trial judge that he was going to question Franczyk regarding statements that Mohammed had made to Franczyk, but that Franczyk's responses were being elicited for the purpose of the motion only. The judge agreed, and defense counsel asked Franczyk again if Mohammed had told him he received the cocaine from "Doc" in a brown Chevy. Franczyk said yes, but stated that he did not include Mohammed's statement in his "buy summary sheet" or any other report he prepared. According to Franczyk, Mohammed made the statement immediately after his arrest, but it was not contained in the transcript of his conversations because the tape recorder had already been turned off.

Postal Inspector Michael Carroll testified that he was the driver of the surveillance van that was situated in the Walgreen's parking lot. Franczyk had previously informed all the surveillance units that he was going to purchase cocaine from Mohammed and that Mohammed was going to meet his source in the Walgreen's parking lot.

Carroll arrived at Walgreen's at approximately 12:20 p.m., followed at 12:37 p.m. by Mohammed, who arrived in his postal vehicle. Carroll observed Mohammed exit the vehicle, walk over to the pay phones, return to the postal vehicle and then drive away northbound on Halsted Street. At 12:47 p.m., Mohammed returned to the parking lot and went inside Walgreen's. He came out of the store two minutes later and used the pay phone. Shortly thereafter, he returned to his postal vehicle and stood beside it.

At 1:08 p.m., a brown Chevy Citation pulled up and parked one space north of the postal vehicle. Mohammed walked over to the Citation and entered the front passenger side. He remained in the car for approximately one minute. He exited the Citation, returned to his postal vehicle and drove away. Carroll identified defendant as the driver of the Citation.

Defendant pulled out onto 126th Street, went west to Halsted and continued south to 127th Street where Carroll's unit lost sight of him. Carroll's unit remained in the parking lot for a couple of minutes until Franczyk advised them over the radio that he had learned that the source of the cocaine Mohammed had given him was the driver of the Citation. Carroll pulled out onto Halsted and began following the Citation, which he estimated was six blocks to a mile ahead. Two or three other surveillance vehicles were already following the Citation. Carroll's unit eventually caught up with the Citation, which had been curbed by other units in the vicinity of 122d and Loomis.

Carroll stated on cross-examination that he did not know if Mohammed had met anyone or exchanged anything with anyone while he was in Walgreen's. Carroll did not see defendant give Mohammed anything while Mohammed was in defendant's car, nor did he know whether Mohammed had the narcotics in his possession prior to entering defendant's car.

Postal Inspector Peter Harrison testified that at 12:20 p.m. on January 2, he and Chicago police detective Roland Theide parked their unmarked police vehicle in the vicinity south of Walgreen's. They could not see the Walgreen's parking lot from their location. Franczyk had earlier informed them that Mohammed was planning to meet with an individual driving a brown Chevy vehicle to receive a quantity of narcotics.

Harrison first saw the brown Chevy Citation heading westbound on 127th Street past Halsted. Shortly before, Franczyk had radioed that the individual in the Citation was the source of the narcotics delivered to Mohammed. Another officer, Inspector Farmer, radioed to Harrison and Theide to begin pursuing the Citation. They activated the police vehicle's alternating headlights and siren. Defendant did not pull his vehicle over, but instead proceeded at a high rate of speed weaving in and out of residential streets for 9 or 10 blocks. Farmer finally curbed defendant's vehicle in the vicinity of 122d and Loomis. Harrison stated that prior to his arrival at the scene, Farmer had fired his gun at defendant.

Harrison observed defendant lying facedown on the ground with his hands beneath his chest. Harrison arrested defendant, searched him and recovered $240 of the prerecorded currency Franczyk had given to Mohammed, which he identified after examining photocopies of the prerecorded currency. In addition, Harrison recovered $230 in unrecorded currency from defendant. The prerecorded currency was returned to Franczyk, and the remainder was inventoried.

On cross-examination, Harrison estimated that he began following the Citation between 1 and 1:05 p.m. He stated that defendant was six or seven blocks ahead by the time he and Theide began following him, but he was never out of their view.

Theide testified that as soon as the Citation pulled away from Walgreen's, he and Harrison were instructed by a postal inspector to follow it. They pursued the Citation for several minutes over a span of seven to nine blocks. At various points throughout the pursuit, their vehicle was within a half a block of defendant's vehicle. Theide said that he was initially driving quickly to catch up to defendant, but that defendant did not stop his vehicle even after they had caught up to him. Farmer fired a shot at defendant because, according to Farmer, defendant reached into his jacket.

After defendant was arrested, Franczyk gave Theide the plastic bag containing a white powder and Theide inventoried it. Subsequent analysis revealed that the plastic bag contained 6.9 grams of cocaine.

Defendant called Carroll, who stated that the Citation was approximately one minute ahead of him when he pulled out of the Walgreen's parking lot. He repeated that he was in the parking lot when he heard Franczyk's radio transmission. Carroll identified his surveillance report, which indicated that the Citation left the parking lot at 1:09 p.m., and that other surveillance units followed him. He did not see the other units, but monitored their activity over the radio. According to Carroll, the objective of the other units initially was just to follow the Citation. They attempted to curb defendant's vehicle only after they had received Franczyk's radio transmission, which he estimated came about two minutes later.

Defendant also called Franczyk. According to Franczyk, the drug transaction with Mohammed that occurred at 1:13 p.m. lasted at most a minute, and Mohammed was arrested within 5 or 10 seconds thereafter. Within a minute or two after Mohammed's arrest, Mohammed informed him that defendant was the source of the cocaine.

The trial court found that the surveillance officers had probable cause to arrest defendant. Consequently, defendant's motion to quash arrest and suppress evidence was denied. The trial court subsequently found defendant and Mohammed guilty of unlawful delivery.

At the sentencing hearing, the State reminded the trial court that at the time the subject offense was committed, defendant was on probation for two other drug offenses and had another drug case pending. The State requested that defendant be sentenced to a term greater than the minimum four years. Defendant told the court that he had lent Mohammed some money and that Mohammed had repaid

him on the date in question. He stated that he did not deliver any drugs to Mohammed.

The trial court terminated defendant's probation as unsatisfactory on the two prior drug offenses. No petition for violation of probation was pending at this time. The trial judge then reminded defendant of a statement he had earlier made to him with respect to the sentence he would impose on defendant if he violated the court's probation. The trial court sentenced defendant to eight years' imprisonment on the subject offense and to two concurrent eight-year prison terms on the probation violations.

Subsequently, defendant petitioned the trial court to stay consideration of his motion to reduce the sentences arising from the violation of probation ruling. Defendant argued that the trial court should retain jurisdiction on those matters for approximately two years until after he appealed the delivery conviction. The trial court declined to retain jurisdiction, but agreed to give defendant a violation of probation hearing. At the next court date, defendant again requested that the court retain jurisdiction over the probation violations while he appealed the unlawful delivery conviction. The trial court again declined to do so, and upheld the sentences it had imposed.

Defendant first contends that the trial court erred in denying his motion for severance where statements made by Mohammed to Franczyk, which implicated defendant in the narcotics transaction, were admitted at the joint trial. Defendant argues that he was denied his right of confrontation since Mohammed did not testify, and he was therefore unable to verify whether Mohammed in fact told Franczyk that he was the cocaine supplier.

The long-established rule in this State is that "defendants jointly indicted are to be jointly tried unless fairness to one of the defendants requires a separate trial to avoid prejudice." (*People v. Byron* (1987), 116 Ill. 2d 81, 92, 506 N.E.2d 1247, 1251.) The decision whether to grant a motion for severance is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *Byron*, 116 Ill. 2d at 92, 506 N.E.2d at 1251.

Exceptions to the rule favoring joint trials exist where the defenses of codefendants are so antagonistic that a fair trial can be achieved only through severance, or where one defendant has made an out-of-court statement that inculpates another defendant and such statement is likely to be admitted into evidence. (*People v. Moore* (1984), 128 Ill. App. 3d 505, 514, 470 N.E.2d 1284, 1290.) This latter situation, which was the focus of *Bruton v. United States* (1968), 391

U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, is what defendant here claims as error.

In *Bruton*, however, the defendant was tried by a jury, and the Supreme Court was concerned with the effectiveness of jury instructions in eliminating the prejudice to the defendant that arose from the use at a joint trial of a nontestifying codefendant's inculpatory statement. Here, defendant and Mohammed were tried by a judge. "A trial judge, sitting as the trier of fact, due to his particular training and experience, is generally believed to have a greater ability to restrict his use of improper evidence and to consider only competent evidence." (*Moore*, 128 Ill. App. 3d at 514, 470 N.E.2d at 1291.) In *People v. Schmitt* (1989), 131 Ill. 2d 128, 545 N.E.2d 665, our supreme court expressed confidence in the trial court's ability to compartmentalize its consideration of evidence. The court declared that, in the absence of proof to the contrary, the reviewing court must presume that the trial court considered only competent evidence in reaching its verdict. (*Schmitt*, 131 Ill. 2d at 138-39, 545 N.E.2d at 669.) Defendant has failed to present sufficient proof to overcome this presumption.

■ Our review of the record indicates that the trial judge properly ignored the testimony relating to Mohammed's statements, which implicated defendant as the supplier of the cocaine, for purposes of the case against defendant. The trial judge expressed from the outset his ability to "compartmentalize" his consideration of the evidence, stating, in his denial of defendant's motion for severance, that he "[could] deal with oral [statements]." Later, when Franczyk was testifying as to Mohammed's statement, that "he received the cocaine from Doc, an individual in a brown Chevy," and to the prior telephone conversation he had with Mohammed, the trial court expressly declared that any statements made by Mohammed would only apply in the case against Mohammed and to defendant only insofar as they related to his motion to quash arrest and suppress evidence. During the cross-examination of Franczyk, the trial court again acknowledged that the inculpatory statement "only applied to the party who made it" because "it [was] hearsay," and agreed to consider it against defendant for purposes of the motion only. The fact that the judge initially confused the defendants' names does not convince us that the judge was also confused as to the proper consideration to be given to Mohammed's statements.

We agree that the trial judge's task of "compartmentalizing" his consideration of the evidence was made all the more difficult by the fact that defendant's motion was heard simultaneously with the joint trial. However, absent more, this fact does not alter our conclusion

that the trial judge properly excluded Mohammed's statements from his consideration in determining defendant's guilt. Moreover, it was at defense counsel's suggestion that the trial court agreed to hear the motion and trial of defendants simultaneously.

Defendant argues that because the trial court did not articulate the factual bases supporting its finding of guilt, it is impossible to exclude the possibility that the court improperly considered Mohammed's hearsay statements against him in finding him guilty. Defendant asserts that *Schmitt* required the trial court to indicate the specific evidence it relied on in making its ruling. The *Schmitt* court did not go that far, however, stating only that a court would "do well to *** recite for the record its findings in each case and the reasons for its rulings." (*Schmitt*, 131 Ill. 2d at 138, 545 N.E.2d at 669.) While we agree with defendant that the trial court would have "done well" to articulate the factual findings underlying its judgment, the fact that it did not do so is not a ground for reversal. We are satisfied that the judge understood fully the limited purpose for which Mohammed's statements were admitted, and that he properly excluded them from his consideration in determining defendant's guilt. We cannot find, therefore, that the trial court abused its discretion in denying defendant's motion for severance.

Defendant also contends that without Mohammed's statement implicating him in the drug transaction, the evidence was insufficient to prove him guilty beyond a reasonable doubt. Specifically, defendant argues that discrepancies in the testimony of the various surveillance officers regarding the timing of events on the date in question create a reasonable doubt as to whether he in fact fled from the officers. Without a finding of flight, the only evidence remaining, according to defendant, is the brief meeting with Mohammed at Walgreen's and the fact that he was found carrying $240 in prerecorded currency. These factors, defendant argues, are insufficient to meet the burden of proof beyond a reasonable doubt, particularly since there are many possible innocent explanations for why he possessed the funds.

Initially, we note that it is not this court's function in reviewing evidence to retry the case. (*People v. Tye* (1990), 141 Ill. 2d 1, 565 N.E.2d 931.) Rather, determinations of the credibility of witnesses, the weight to be given to their testimony, the reasonable inferences to be drawn from the evidence, and the resolution of conflicts in the testimony of witnesses are responsibilities of the trier of fact. (*Tye*, 141 Ill. 2d at 13, 565 N.E.2d at 937; *People v. Negron* (1991), 220 Ill. App. 3d 754, 580 N.E.2d 1301.) In considering a defendant's challenge to the sufficiency of the evidence, the reviewing court must determine

whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461.) Reversal is permissible "only where the evidence is so palpably contrary to the finding of guilt, or so unreasonable, improbable or unsatisfactory that it raises reasonable doubt of the defendant's guilt." *People v. Moody* (1990), 199 Ill. App. 3d 455, 466, 557 N.E.2d 335, 343.

Although the trial court did not expressly state, it is apparent from the record that defendant was convicted of delivery of a controlled substance on an accountability theory. To sustain such a conviction, the State must establish beyond a reasonable doubt that: (1) the defendant solicited, ordered, abetted, agreed or attempted to aid another in the planning or commission of the delivery; (2) the defendant's participation took place before or during the commission of the delivery; and (3) the defendant had the concurrent, specific intent to promote or facilitate the commission of the offense. (*People v. Melgoza* (1992), 231 Ill. App. 3d 510, 537, 595 N.E.2d 1261, 1281; Ill. Rev. Stat. 1987, ch. 38, par. 5—2.) The trier of fact may infer a defendant's accountability from evidence of conduct showing a design on his part to aid in the offense. *Melgoza*, 231 Ill. App. 3d at 537, 595 N.E.2d at 1281.

■ After reviewing the record, we conclude that the evidence, when viewed in a light most favorable to the State, could lead a rational trier of fact to find defendant accountable for unlawful delivery beyond a reasonable doubt. Defendant does not dispute that he met with Mohammed in the Walgreen's parking lot minutes before Mohammed delivered the cocaine to Franczyk. Carroll testified that Mohammed initially arrived at Walgreen's at 12:37 p.m., remained for a short time, and then drove away. He returned at 12:47 p.m. and went inside Walgreen's. A few minutes later, he exited the store, used the pay phone, and then went back to his postal vehicle and stood alongside it. While these events were transpiring, Franczyk was waiting for Mohammed at the agreed-upon location, as Mohammed had instructed him to do. At 1:08 p.m., defendant drove into the parking lot in a brown Citation. Mohammed entered defendant's vehicle, where he remained for approximately one minute. Immediately thereafter, Mohammed left the parking lot in his postal vehicle and delivered the cocaine to Franczyk. A subsequent search of Mohammed revealed that he possessed only $20 of the $280 in prerecorded currency Franczyk had given him, while a search of defendant revealed that he was carrying $240 of the currency.

From these events, the trial court could have reasonably concluded that defendant was the source of the cocaine because when Mohammed exited the store he did not leave to meet Franczyk but instead waited alongside his vehicle, even though he knew Franczyk was waiting for him. Only after Mohammed met with defendant did Mohammed leave to deliver the cocaine to Franczyk. In our view, had Mohammed been able to produce the cocaine without his contact with defendant, he would have done so. See *Melgoza*, 231 Ill. App. 3d at 539, 595 N.E.2d at 1282.

As to the flight of defendant, Carroll noted on the surveillance log that defendant left the parking lot at 1:09 p.m. Carroll lost sight of defendant after he turned onto 127th Street. Carroll remained in the parking lot until he heard Franczyk's radio transmission naming defendant as the source of the cocaine, which he estimated was about two minutes. Franczyk stated that Mohammed named defendant as the supplier no later than 1:14 or 1:15 p.m. That Carroll's testimony as to how much time elapsed before defendant was implicated differs from Franczyk's testimony is not fatal since Carroll was merely estimating from memory. As stated, the resolution of such evidentiary conflicts is within the sole province of the trier of fact, which we will not second-guess. *Negron*, 220 Ill. App. 3d at 771, 580 N.E.2d at 1314.

Harrison and Theide were parked somewhere south of Walgreen's, and it is unclear from the record at exactly what time they first observed defendant's vehicle. Harrison gave a rough approximation of 1 or 1:05 p.m. In ascertaining the truth, however, it was the prerogative of the trial court, in reliance on the surveillance log which indicated that defendant did not leave Walgreen's until 1:09 p.m., to disregard this testimony and determine that they actually saw him several minutes later. (See *People v. Purnell* (1984), 126 Ill. App. 3d 608, 467 N.E.2d 1160.) The record indicates that they could not see the Walgreen's parking lot from their location. Harrison stated generally that they first saw the Citation heading westbound on 127th Street past Halsted. Both Harrison and Theide testified that they began chasing defendant after they received Franczyk's transmission naming defendant as the source of the cocaine. According to Harrison, they activated the police vehicle's alternating headlights and siren, and began pursuing defendant. Both stated that they were initially some distance behind him and had to speed to catch up to him. Theide testified that at various points throughout the several block pursuit, their vehicle was within half a block of defendant's vehicle,

and that even once they had caught up to him, but defendant still did not pull over.

Defendant argues that he would have been farther away from Walgreen's in the five or six minutes which elapsed before Mohammed implicated him than that distance to which Theide and Harrison testified. As we have stated, however, neither Theide nor Harrison gave the precise time at which they first observed his vehicle. The record indicates only that they were situated somewhere south of Walgreen's, and that they first saw defendant "heading west on 127th Street past Halsted." There was no testimony as to the speed at which defendant was traveling or to his actions after he left Walgreen's and traveled out of Carroll's sight and before he was observed by Theide and Harrison. We will not speculate as to what might have happened. Our sole function is to determine whether the evidence reasonably supports a finding that defendant fled from the surveillance officers, notwithstanding the discrepancies noted by defendant. We find that it does.

The trial court's finding of guilt is further strengthened by the fact that defendant was found carrying $240 in prerecorded currency. Harrison stated that he knew that $240 of the $470 recovered from defendant was part of the prerecorded currency Franczyk had given to Mohammed because he compared it with photocopies that had been made of the currency. Contrary to defendant's contention, the fact that the recovered funds were not offered into evidence at trial does not make Harrison's testimony in this regard inadmissible. Rather, the absence of the funds in evidence affects only the weight to be assigned to Harrison's testimony by the trial court.

Defendant cites *People v. Darnell* (1990), 214 Ill. App. 3d 345, 573 N.E.2d 1252, in support of his position that the evidence was insufficient to prove him guilty beyond a reasonable doubt. In *Darnell*, we reversed the convictions of two codefendants after finding insufficient evidence to hold them accountable for unlawful delivery. Defendant argues that the facts in *Darnell* are analogous to the facts here. While we agree with defendant that they are similar in some respects, they vary in several significant respects and are therefore distinguishable.

Unlike this case, in *Darnell*, the defendant who actually delivered the narcotics to the undercover officer testified at trial that the two codefendants had no knowledge that a drug transaction was taking place while they were with him. Prior to meeting with the undercover officer to consummate the drug transaction, the defendant told the codefendants only that he had to meet briefly with someone before go-

ing to the track. Both codefendants testified that this was in fact what the defendant had told them. The testimony in this regard was bolstered by the fact that the defendant had on four other occasions conducted drug transactions with the undercover officer with no involvement by either of the codefendants.

Further, while one of the codefendants was seen holding the bag containing the narcotics, no evidence, direct or circumstantial, was offered at trial to support the State's contention that he knew what was inside the bag. In this case, on the other hand, the State offered evidence of defendant's flight from surveillance officers minutes after he had met with Mohammed. This, coupled with his possession of prerecorded currency, is strong circumstantial evidence that he knowingly participated in the drug transaction. The fact that the officers did not hear defendant and Mohammed discussing the sale of the cocaine, and did not see defendant receive money or give Mohammed the cocaine, does not negate a finding of guilt on an accountability theory since the trial court was free to infer defendant's accountability from the foregoing conduct. *Melgoza*, 231 Ill. App. 3d at 537, 595 N.E.2d at 1281.

We do not find the evidence to be so palpably contrary to a finding of guilt, or so unreasonable, improbable or unsatisfactory as to justify reversal on the basis of insufficient evidence. On the contrary, we find the evidence to be more than sufficient to sustain defendant's conviction.

Defendant further contends that the trial court violated his right to due process by depriving him of a fair and impartial trial, and by imposing additional sentences on a finding that he violated probation, even though no petition for violation was pending and no hearing on such petition was afforded him.

As to the first of the due process contentions, defendant argues that the trial judge was biased against him, and he cites this alleged bias as the basis for the judge's finding of guilt.

■ In support of this claim, defendant first points to a statement the trial judge made at the September 30, 1988, hearing sentencing him to probation on the prior drug convictions. The trial judge stated, "If you don't successfully complete this court's probation sentence \*\*\*, I am going to sentence you to ten years in the penitentiary. Do you understand that?" Defendant argues that this comment by the trial judge demonstrates that he was incapable of being fair and impartial at the trial. We disagree. We agree with the State that the comment was merely an attempt by the judge to impress upon defendant the import of his action. A defendant is not denied due pro-

cess simply because the trial court predetermined the defendant's sentence, even before probation was revoked. (*People v. Acevedo* (1991), 216 Ill. App. 3d 195, 202, 576 N.E.2d 949, 953.) Defendant could have been sentenced to between 4 and 15 years for the convictions underlying the probation sentence. That the trial judge articulated the sentence he would impose in the event defendant failed to adhere to the terms of probation does not constitute bias or prejudice against him. Nor does the fact that the trial judge recalled at the sentencing hearing on the unlawful delivery charge the "promise" of penitentiary time he previously made in the event defendant violated probation. In short, we find these unsupported allegations to be without merit.

■■ Defendant raises a number of other incidents which occurred at the trial in support of his claim of bias. Such incidents include the trial court's denial of his motion for severance and its lack of explanation with respect to its rulings. These issues we have already addressed. We do not find that these factors, and the others raised in defendant's brief, support his claim of bias.

■■ Lastly, defendant contends that the trial court lacked subject matter jurisdiction to revoke his probation and impose two additional, concurrent eight-year sentences. We agree. Our supreme court has held that the Unified Code of Corrections (Ill. Rev. Stat. 1991, ch. 38, par. 1005—6—4(a)) contemplates the revocation of an offender's probation only upon the filing by a proper party of a petition charging a violation of a condition of probation. (*People v. Dinger* (1990), 136 Ill. 2d 248, 554 N.E.2d 1376.) The record reveals that on May 4, 1992, the date defendant's probation was revoked, no petition for violation of probation was pending.

The Unified Code of Corrections also specifies that the period of probation shall be tolled by personal service of the petition or the issuance of such warrant, summons or notice, and the period shall not run until the hearing and disposition of the petition for violation. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—6—4(a)(3).) Absent such a tolling, the court, however, has no authority to revoke a defendant's probation after the period of probation has expired. *People v. Martinez* (1986), 150 Ill. App. 3d 516, 517-18, 501 N.E.2d 1003, 1004.

Defendant's 18-month and 30-month terms of probation began running on September 30, 1988. Thus, in the absence of a tolling by personal service of the petition, the terms of probation were set to expire on March 30, 1990, and March 31, 1991, respectively. The State did file a petition for violation of probation, but that petition was dismissed on January 30, 1990. Thus, the period of probation began to run again, and the trial court was without jurisdiction to revoke

defendant's probation in May 1992. By that time, the terms of probation had expired. Accordingly, that portion of the trial court's judgment revoking defendant's probation and imposing the additional eight-year sentences of imprisonment must be vacated.

For the foregoing reasons, the judgment of the circuit court of Cook County as to the present offense is affirmed; that portion of the judgment imposing concurrent sentences for violations of probation is vacated.

Affirmed in part; vacated in part.

RAKOWSKI and GIANNIS, JJ., concur.