NO. 4-08-0385    Filed 11/4/09

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: SETH S., a Minor, | ) | Appeal from |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Schuyler County |
| v. | ) | No. 06JD22 |
| SETH S., | ) | |
| Respondent-Appellant. | ) | Honorable |
| | ) | Alesia A. McMillen, |
| | ) | Judge Presiding. |

_____

JUSTICE MYERSCOUGH delivered the opinion of the court:

In October 2006, the State filed a petition for the adjudication of wardship of respondent, Seth S., born October 29, 1991. The petition alleged that respondent was delinquent for committing two offenses of aggravated criminal sexual assault against his sister (720 ILCS 5/12-14(b)(i) (West 2006)) and one offense of sexual abuse against his brother (720 ILCS 5/12-15(b) (West 2006)). In May 2007, respondent pleaded guilty, and the trial court sentenced him to five years of probation.

In January 2008, the trial court revoked respondent's probation. In February 2008, the court resentenced respondent to an indeterminate term in the Department of Juvenile Justice (DOJJ).

Respondent appeals, arguing (1) the trial court erred by revoking respondent's probation because (a) the trial judge was biased against probation from the outset as evidenced by her comments and impatience throughout the case and (b) the record established respondent's slow but satisfactory progress toward

treatment goals; and (2) the trial court erred by committing respondent to DOJJ where (a) the trial judge relied on her review and interpretation of judicial training material that she refused to make part of the record and (b) the disposition was against the manifest weight of the evidence and fatally tainted by the court's misuse of the Juvenile Sex-Offender Assessment Protocol-II (J-SOAP-II)) materials that were not in the record. We affirm the trial court's order revoking respondent's probation but reverse the court's dispositional order and remand for a new dispositional hearing.

## I. BACKGROUND

The petition for adjudication of wardship alleged that between January 1, 2003, and April 7, 2006, respondent committed the offense of aggravated criminal sexual assault (720 ILCS 5/12-14(b)(i) (West 2006)) in that respondent (1) committed an act of sexual penetration with J.S., who was under age nine, involving the mouth of J.S. and the penis of respondent and (2) committed an act of sexual penetration with J.S. involving the vagina of J.S. and the penis of respondent. The petition also alleged that between July 2003 and April 7, 2006, respondent committed the offense of criminal sexual abuse (720 ILCS 5/12-15(b) (West 2006)) by committing an act of sexual conduct with T.S., who was at least 9 years old but under the age of 17 when the act was committed, involving the penis of T.S. and the hand of respondent and done for the purpose of sexual gratification or arousal of respondent. J.S. was respondent's younger sister (born August

31, 1999), and T.S. was respondent's younger brother (born June 17, 1994).

## A. Facts Pertaining to the January and March 2007 Hearings

In January 2007, the parties proposed a plea agreement. Under the proposed agreement, respondent would be placed on probation for five years with the standard conditions, as well as the condition that he successfully complete sex-offender treatment and counseling with an approved counselor. The parties also agreed to waive a social-history report because respondent had already undergone a sex-offender evaluation. The trial court reviewed the sex-offender evaluation, which is contained in the record on appeal.

The sex-offender evaluation, conducted in September 2006 by Karen L. Streight, M.A., LCPC, reported that respondent had a "previous history of assault on peers and fire setting." Respondent reported (1) his parents had problems with marital discord and (2) past physical abuse of respondent by his father and recent verbal abuse.

Streight's report also indicated that in the spring of 2006, after discovery of respondent's sexual abuse of his siblings, respondent went to live with his grandmother. The family engaged in counseling, and a safety plan was implemented that prohibited unsupervised contact between respondent and his siblings. However, respondent's parents began to allow visits between the children. Respondent admitted molesting his sister once during those visits, although his sister reported it oc-

curred three times. Streight's report noted that the Department of Children and Family Services (DCFS) investigator, law enforcement, and the child-welfare specialist recommended residential treatment. Streight recommended outpatient treatment because (1) no evidence suggested that respondent's overall behavior and functioning ability were significantly compromised; and (2) he was not mentally retarded and, during the interview, Streight observed no blatant obstacles to respondent's ability to acquire and apply knowledge. Streight noted, however, that if it became evident that respondent was not gaining internal-control mechanisms or that he failed to make progress, treatment in a residential setting should be considered.

At the conclusion of the hearing, the trial court expressed concern with the proposed agreement and questioned whether an "inpatient placement" was more appropriate. The court also expressed concern with respondent attending the public high school that was only separated from the middle school by an unlocked door. The State's Attorney and the DCFS representative advised the court that respondent had a one-on-one aide with him at all times at the school (because of the allegations against respondent). Nonetheless, the court set the matter for an adjudicatory hearing with the understanding that respondent would begin counseling immediately with Terry Campbell, and the court would, with the agreement of the parties, conduct a phone conference with Streight and Campbell.

At the next hearing in March 2007, the trial judge

- 4 -

indicated she had spoken with the counselors. The judge reported that Campbell informed her that respondent was doing well in outpatient treatment. Campbell also indicated he would submit a report addressing respondent's likelihood of reoffending. The trial court's March 2007 review order directed the State to contact Campbell for an updated report.

On April 24, 2007, the State filed an April 2007 report prepared by Campbell. The cover letter on the report noted that (1) treatment was slow and lengthy due to the issues and respondent's limited intellectual capacity and (2) J-SOAP-II placed respondent in a group of sex offenders whose proportion of risk was in the "low moderate" range. The report itself outlined Campbell's various testing of respondent, including the administration of J-SOAP-II, a checklist whose purpose is to aid in the systematic review of risk factors that have been identified in the professional literature as being associated with sexual and criminal offending. Campbell's report noted that respondent's risk factors as identified in J-SOAP-II included (1) the number of victims (factor 2), (2) that a male child victim was involved (factor 3), (3) the duration of the offense history (factor 4), (4) the planning of the offense (factor 5), (5) respondent's sexualized aggression (factor 6), (6) respondent's sexual drive and preoccupation (factor 7), (7) respondent's pervasive anger (factor 10), (8) respondent's school behavior problems (factor 11), and (9) respondent's physical-assault history-exposure to family violence (factor 16).

B. Facts Pertaining to the May 2007 Negotiated Plea

In May 2007, respondent entered a negotiated plea to all three counts. After receiving a factual basis and confirming that the plea was voluntary, knowing, and intelligent, the trial court accepted the plea.

In the written order, the trial court made respondent a ward of the court and placed respondent on probation for five years. The court directed that respondent live with his grandmother or other adult approved by DCFS. One of the conditions of respondent's probation was that he undergo and successfully complete sex-offender treatment and counseling.

C. Facts Pertaining to the August 1, 2007, Status Hearing

The status-review-hearing documents filed in advance of the August 1, 2007, status hearing provided the following. Respondent's progress in counseling was slow, and Campbell had indicated to respondent's parents that respondent would be in treatment the entire five years of probation. Respondent's cognitive ability and general verbal comprehension abilities were in the "extremely low" range, while his general perceptual reasoning abilities were in the "borderline" range.

Campbell's report indicated--without providing a time frame--that respondent had been taking his grandmother's underwear, Kotex, and Vaseline and masturbating with those items. "Early on" he was seen by his grandmother masturbating in his bedroom. However, the report indicated that respondent denied any sexual fantasies for a month or so.

At the August 1, 2007, status hearing, the trial court confirmed receipt of the status and addendum and that no one had any additions or corrections.  The court noted that respondent had not made much progress in counseling.  The court advised respondent that if he did not make significantly more improvement, "this isn't going to work."  The court specifically referred to respondent engaging in "that kind of behavior" in the view and presence of his grandmother.  The court also expressed concern with respondent attending the public school.  The court acknowledged that respondent would be in therapy throughout his probation but that the issue was whether therapy was going to work.  The court noted:

> "So I just want everybody to understand, you know, my patience to let the therapy work and let [respondent] work through the therapy is going to be pretty short-lived.  So if I don't begin to see some real work on [respondent's] part to control these behaviors, I'm not going to stay here indefinitely and wait for somebody else to be a victim.  Not going to happen."

The court set the next status review for October 2007.

D. Facts Pertaining to the October 3, 2007, Status Hearing

The status-review-hearing documents filed in advance of the October 3, 2007, hearing established the following.  Campbell reported that progress was satisfactory.  Respondent denied any

deviant sexual thoughts during the quarter. No evidence showed inappropriate sexual behaviors. The report also provided that of the eight treatment goals, respondent received a rating of four out of five (with five being the highest) for (1) motivation for treatment, (2) making full disclosure of and taking full responsibility for the sexual offenses, and (3) positive behavior in the community. Respondent received a rating of one out of five for the goals of (1) identifying and understanding the offense cycle, (2) developing a relapse-prevention plan, and (3) exhibiting victim empathy. Respondent received a three for the goal of identifying thinking errors and a two for decreasing arousal to deviant stimuli.

At the status hearing, the trial court noted the ratings respondent received on his goals. The court observed that while respondent had a long way to go, he had been attending all counseling sessions and Campbell recommended further treatment. The court found that treatment would continue but that things had to turn around because the court would not be convinced that counseling was beneficial when half of the goals in counseling were rated unsatisfactory. The court set the next status hearing for January 2, 2008, later continued to January 9, 2008.

### E. Facts Pertaining to the Anticipated January 9, 2008, Status Hearing

The status-review report filed in anticipation of the January 2008 status hearing provided the following. Campbell rated respondent's treatment goals as follows: respondent re-

ceived a four on the goals of (1) motivation for treatment, (2) full disclosure of and taking full responsibility for the sexual offenses, and (3) positive behavior in the community. Respondent received a rating of three on the goals of (1) identifying thinking errors, (2) decreasing arousal to deviant stimuli, and (3) identifying and understanding the offense cycle. Respondent received a two on developing a relapse-prevention plan and a one for exhibiting victim empathy.

Campbell noted that respondent had difficulty expressing his feelings because (1) he learned the cultural rule that real men do not express feelings other than anger; and (2) in order to deal with conflict at home, he had learned to numb his feelings because he was powerless to do anything about his feelings. Respondent had a lot of anger about his parents' chronic conflicts.

Campbell noted that respondent had been cooperative in treatment except for his failure to keep a journal about his feelings. Respondent denied any deviant sexual fantasies for the last five or six months. Campbell believed respondent's medication (Zoloft) helped with that. Campbell recommended continuing with the present course of treatment.

F. Facts Pertaining to the Petition To Revoke
      Probation and the Detention Hearing

On January 9, 2008, the date set for the status review, the State filed a petition to revoke probation. The State alleged:

"The minor violated his probation in

- 9 -

that he has failed to successfully complete or comply with sex[-]offender treatment and counseling[.] [S]pecifically[,] within the last few weeks he was found to have possessed in his bedroom various sexual aids and devices and admitted to his therapist/counselor that he did not use any of the interventions to prevent himself from engaging in sexual behavior as he had been taught to do through counseling and expressed to his counselor that he could not stop his need to engage in sexual behavior."

That same day, the trial court held a detention hearing. Respondent's probation officer testified, and the court admitted into evidence the letter Campbell sent to the probation officer. That letter, dated January 9, 2008, indicated that Campbell confronted respondent about the items his mother found on his bed--lotion, a toy used for anal stimulation, and a women's magazine. Respondent could not recount the feelings or the thought process he had leading up to his decision to use those items. Respondent could only say, "I can't stop it." Respondent also offered the excuse that he had not taken his medication for a couple of days.

Campbell's letter noted that at this point in treatment, respondent had learned interventions to deal with those urges and that he should have had time to check his thinking and

- 10 -

use interventions. Campbell noted that respondent chose not to use any interventions and his actions indicated that outpatient treatment had not been effective. Campbell recommended a "more secure environment with more intensive therapy."

The trial court found probable cause to believe that respondent violated his probation and that detention was necessary for the protection of a person or property of another. In her comments, the trial judge noted her concern from the beginning about whether outpatient therapy was going to work and about respondent being in the public school. The judge believed that because the offenses by respondent against his siblings took place over a number of years, that indicated he had a very high risk to reoffend. The judge also stated that within less than a year on probation, respondent had "two reoffenses" (referring to the "inappropriate material" found early on and the more recent incident). The court believed this behavior was indicative of "someone who then is ready to assault individuals."

### G. Facts Pertaining to the Hearing on the Petition To Revoke Probation

On January 23, 2008, the trial court held a hearing on the petition to revoke probation. Respondent's mother, Diana, testified that on December 24, 2007, she found a "True Story" magazine (a mostly print romance magazine), a bottle of lotion, and a G.I. Joe missile toy on the floor of respondent's bedroom. (Respondent apparently visited his parents' home at times when his siblings were not there.) The items were not normally in his room and were the type of thing Diana had been instructed to look

for.  When confronted, respondent did not want to talk about it and cried.  Diana reported the incident to Campbell on January 8, 2008.

Campbell testified that he began counseling respondent in January 2007.  Campbell conducted an evaluation to determine the treatment plan.  The treatment plan included the following goals: (1) taking full responsibility for his sexually abusive behavior, (2) learning to identify and change thinking errors, (3) learning to reduce deviant arousal patterns, (4) learning to identify the offense cycle, (5) coming up with a relapse-prevention plan to use techniques to get out of an offense cycle, and (6) learning empathy for the victims.  However, Campbell testified that he and respondent had not yet worked on empathy because respondent was not able to identify his feelings, a prerequisite for empathy.

Campbell testified that "[p]rogress was satisfactory a lot of the times," meaning that he had no indication that treatment was not effective.  In April 2007, an incident occurred where respondent's grandmother's underwear, a tampon, and some Vaseline were found in respondent's room.  Respondent indicated he had used those items for masturbation fantasies and the tampon for anal stimulation.  Campbell used that incident to discuss with respondent that respondent needed to manage his thoughts and feelings and to discuss relapse-prevention techniques.

In early summer 2007, Campbell instructed respondent to keep a journal of his feelings to help respondent learn to

identify his feelings and write them down to talk about in the sessions. Respondent never complied with that despite repeated reminders. Campbell testified that it was important for respondent to keep the journal because respondent had problems identifying and talking about his feelings, and sex offenders act on their feelings. According to Campbell, if respondent could not identify his feelings, then a relapse-prevention plan was not going to work for him.

After Diana told Campbell what she had found, Campbell spoke to respondent. Respondent admitted he had used the magazine as a stimulus and the missile toy for anal stimulation. Campbell attempted to discuss with respondent the feelings he was having around the time he was using those items. Respondent was not able to express what his feelings were at the time or what he thought led up to him using those items. "Basically, it came down to, he was only able to say that he wasn't able to stop himself." Respondent told Campbell he had done it twice. Campbell testified that the sexual behavior indicated that respondent was "not able to manage his behavior, his thoughts, his feelings, or behaviors, and had not been able to use any of those techniques or interventions that we had talked about."

On cross-examination, Campbell admitted that respondent's verbal and language skills had tested at below average. Because of this, Campbell expected treatment with respondent to take longer than was typical--two to three years as opposed to one to two years.

Through counseling, Campbell determined that respondent's "trigger emotion" appeared to be anger toward his parents. Campbell agreed that the abuse of respondent's siblings appeared to be "kind of a revenge thing."

Campbell admitted on cross-examination that for most people, masturbation was a normal process in one's sexual life. On redirect, however, Campbell explained that masturbation was not normal for respondent because the whole point of treatment was to help respondent manage his behaviors, thoughts, and feelings. The danger, according to Campbell, was that it could escalate. At that point in treatment, respondent was not supposed to masturbate, although Campbell admitted some conflict among counselors existed on that issue.

Campbell testified that his December 20, 2007, opinion --that respondent's progress was satisfactory--had changed after learning about respondent's most recent masturbation incident. Campbell stated that because respondent could not explain the thoughts and feelings that preceded the act, respondent was essentially going to be starting over with counseling. In Campbell's opinion, respondent's progress was not acceptable. In fact, Campbell testified he had terminated respondent from Campbell's counseling program.

Upon examination by the trial court, Campbell testified that respondent's purported failure to take his medication for a couple of days might have had an effect on his ability to control his actions and feelings. Campbell also admitted that,

if respondent really did not take his medication, that would mean respondent was not compliant with his treatment. Campbell recommended inpatient treatment, which would be more intensive and would include daily sessions.

Following the hearing, the trial court revoked respondent's probation. The court noted that the issue was not that respondent masturbated. Instead, the issue was that respondent could not "open up and share in counseling." Therapy could not work if respondent could not express his feelings or how he felt when the episodes overtake him. The court noted that even if it was normal to have sexual thoughts, respondent was reporting that he was not having sexual thoughts. The court concluded that respondent had failed to make any progress toward his counseling goals.

Respondent's counsel moved to vacate the detention order. The trial court denied that motion.

### H. Facts Pertaining to the Motion To Reconsider the Order Revoking Probation

On February 25, 2008, respondent filed a motion to reconsider the ruling revoking his probation. Respondent argued that he did not fail to complete or comply with sex-offender treatment or counseling. Specifically, respondent asserted that based on his level of functioning (1) Campbell's counseling was inappropriate and (2) counseling would take an extended period of time. Respondent also argued that because Campbell reported that respondent's progress was satisfactory as of December 20, 2007, the intervening event was insufficient to warrant termination of

probation.

On February 25, 2008, at the dispositional hearing, respondent's counsel sought to submit additional testimony from Dr. Helen Appleton, a clinical psychologist, in support of his motion to reconsider the order revoking probation. The trial court denied that request and denied the motion to reconsider the order revoking probation.

I. Facts Pertaining to the Dispositional Hearing

On February 11, 2008, the probation office filed a social-history report. Documents attached to the social-history report included the police report, the 2007 DCFS assessment, school records, Campbell's progress reports, and Streight's 2006 evaluation.

On February 25, 2008, the trial court held the dispositional hearing. The State presented no evidence in aggravation. In mitigation, respondent called Dr. Appleton to testify.

Dr. Appleton testified that in preparation of the hearing, she was given approximately 700 pages of material-- school records, transcripts of prior hearings, and records from Campbell. However, she admitted she did not have the opportunity to review everything. She did not remember reviewing the social-history report. She also had some difficulty reading some of Campbell's notes and did not always know what he meant or what he was saying in those notes. Dr. Appleton did not evaluate or meet with respondent in person.

Dr. Appleton believed three factors were important in determining the appropriate disposition for respondent: (1) whether respondent had an apparent severe emotional disturbance, which it appeared that he did not; (2) whether respondent was dangerous, which she believed he was not a danger to the community because there were no sexual behaviors outside the family and respondent had friends; and (3) respondent's amenability to treatment, which she believed that he was.

Dr. Appleton criticized Campbell's treatment for using techniques appropriate for adults, as opposed to teenagers, and for not helping respondent do a better job of expressing feelings. She based this on reading his notes, which she admitted she had difficulty reading. Dr. Appleton believed respondent would fare well in developmentally appropriate, community-based outpatient treatment. If she evaluated respondent, she would want to readminister J-SOAP-II, the standard test of risk for juveniles. She also testified about additional testing she would perform, including additional intelligence testing and the Minnesota Multiphasic Personality Inventory.

Based on the information she had reviewed, Dr. Appleton believed respondent was a good candidate for outpatient, community-based treatment. She believed DOJJ was particularly ill-suited for respondent because of his low self-esteem, weaknesses in social skills, and below-average intelligence. However, Dr. Appleton did not know where respondent would get appropriate outpatient community counseling because Dr. Appleton

was not familiar with the area.

Respondent's one-on-one aide at school, Jackie Gilson, testified that respondent seemed fine having her as an aide. Gilson never saw respondent act combative or show any sexual behavior. Gilson testified respondent had friends and was respectful of the teachers.

Sue Kirkham, respondent's special-education teacher and case manager, testified that respondent was respectful to his teachers. She was not aware of any dangerous behavior by respondent. Respondent had difficulty staying on task with work at school, but he understood what was required of him in his special-education classes.

The State recommended the trial court resentence respondent to DOJJ where he could receive sex-offender treatment. Respondent's counsel recommended developmentally appropriate outpatient treatment or residential treatment not in DOJJ. Respondent was given the opportunity to speak. He stated that he "tried to do stuff" but then broke down crying.

The trial court resentenced respondent to an indeterminate term in DOJJ and, in the written order, strongly recommended respondent receive sex-offender treatment. The court based the disposition on the court's review of the social history, the testimony, counsel's recommendations, respondent's statement, and the seriousness of the charges.

The trial court, although noting that Dr. Appleton had been very thorough in other cases in which she had testified, had

not reviewed everything given to her in this case. The court concluded that Dr. Appleton's opinion in this should be "taken with a large grain of salt" because Dr. Appleton admitted she had neither read everything in the file nor understood everything she read, such as Campbell's notes. The court specifically found that Dr. Appleton's suggestion that Campbell was unethical in this case was unpersuasive.

The trial court noted that respondent's attorney categorized DOJJ as simply "corrections," but that DOJJ's purpose included treatment. The court found that residential placement other than DOJJ was not available for lack of funding and the lack of an appropriate facility nearby.

As is relevant to this appeal, the trial court dis-cussed J-SOAP-II in great detail. The court noted that Dr. Appleton indicated her awareness of J-SOAP-II but that some of her testimony was in direct contravention to J-SOAP-II. For instance, the court found that Dr. Appleton

> "would make it appear that there's nothing to
> be concerned about in this case because we
> have offended family members, and nothing
> could be farther from what the J-SOAP[-II]
> indicates the important factors for the
> [c]ourt to look at in determining whether
> someone is likely to reoffend or not."

The trial judge noted that she had some training and was familiar with the assessment tools used in these cases,

including J-SOAP-II.  The trial court went through all of the factors listed in J-SOAP-II.  When respondent's counsel asked the judge if she was going to make the factors she looked at part of the record, the judge responded that she was going to state them.  Counsel asserted that the judge was referring to something outside the record.  The judge noted, however, that she was referring to what was done and discussed by the attorneys with Campbell during his evaluation and referred to by Dr. Appleton.  Respondent's counsel, however, informed the court he had looked through Campbell's material where Campbell summarized the J-SOAP-II factors, but counsel wanted the entire J-SOAP-II material the judge was reviewing to be made part of the record.  The trial judge stated that she read all the statements she considered into the record verbatim.

J. Facts Pertaining to the Motion To Reconsider the Disposition

On March 24, 2008, respondent filed a motion to reconsider his sentence.  Respondent argued that the witnesses agreed that respondent was not a danger to the public and that no evidence or information suggested respondent was a danger to the public.  According to respondent, the unchallenged evidence at the disposition hearing clearly established that community-based counseling was the best alternative.  Respondent further argued that the education and counseling he would receive at DOJJ was inferior to the education and counseling he was receiving in the community.

Following a hearing, the trial court denied the motion

to reconsider sentence.

This appeal followed.

## II. ANALYSIS

On appeal, respondent argues (1) the trial court erred by revoking respondent's probation because (a) the trial judge was biased against probation from the outset as evidenced by her comments and impatience throughout the case and (b) the record established respondent's slow but satisfactory progress toward treatment goals; and (2) the trial court erred by committing respondent to DOJJ where (a) the trial judge relied on her review and interpretation of judicial training material that she refused to make part of the record, and (b) the disposition was against the manifest weight of the evidence and fatally tainted by the court's misuse of the J-SOAP-II materials that were not in the record.

### A. Trial Court Did Not Err by Revoking Respondent's Probation

Respondent argues the trial court erred by revoking his probation. Specifically, respondent argues that (1) the trial judge was biased against probation from the outset as evidenced by her comments and impatience and (2) the record established respondent's slow but satisfactory progress toward treatment goals.

The State must prove a violation of probation by a preponderance of the evidence. In re Justin M.B., 204 Ill. 2d 120, 125, 787 N.E.2d 823, 826 (2003); 705 ILCS 405/5-720(3) (West 2008). This court will not disturb a trial court's ruling on a

- 21 -

petition to revoke probation unless it is against the manifest weight of the evidence. In re N.W., 293 Ill. App. 3d 794, 799, 688 N.E.2d 855, 858-59 (1997).

Respondent first asserts the trial court erred by revoking his probation because the judge was biased against the probation disposition from the start. Respondent points to several of the judge's comments, including (1) referring to the masturbation incidents as "reoffenses" at the detention hearing; (2) repeatedly questioning whether probation was the appropriate disposition; (3) expressing concern about respondent attending the public high school where only a door separated the high school and middle school; and (4) stating that her patience to let therapy work would be short-lived.

Respondent never raised this issue in the trial court. Therefore, the issue is forfeited. See, e.g., People v. Thornton, 70 Ill. App. 3d 532, 533-34, 388 N.E.2d 923, 924 (1979) (noting that the appellate court could find forfeited the defendant's argument on appeal that the trial court was biased, prejudiced, or acted improperly for failure to raise it in the trial court, although the court did address the issue and found no actual bias); People v. Nevitt, 135 Ill. 2d 423, 460, 553 N.E.2d 368, 383 (1990) (finding the defendant forfeited his claim that a comment by the trial judge demonstrated the trial judge's bias against him where the defendant raised it for the first time before the supreme court).

Moreover, even if this court addressed the issue on

appeal, we would find no error. That the judge continued to question whether probation was the appropriate disposition and made it clear that she expected progress to justify the disposition was not inappropriate or indicative of bias. See, e.g., People v. Bedell, 253 Ill. App. 3d 322, 335-36, 624 N.E.2d 1308, 1317 (1993) (finding "[a] defendant is not denied due process simply because the trial court predetermined the defendant's sentence, even before probation was revoked" where the trial court told the defendant that if he did not successfully complete probation, the court would sentence him to 10 years in the penitentiary).

The trial court's concerns have support in the record. In fact, Streight's September 2006 evaluation noted that DCFS and law enforcement recommended residential treatment. Streight's evaluation noted her belief that respondent could succeed in outpatient treatment but that residential treatment might be necessary if (1) respondent failed to make progress in outpatient treatment and (2) if it became evident that respondent was not gaining internal-control mechanisms. The judge's repeated expressions of her concern about the propriety of probation were neither inappropriate nor indicative of actual bias.

Although the trial judge did refer, at the detention hearing, to respondent's masturbation episodes as "reoffenses," she did not refer to them as such at the probation-revocation hearing. Moreover, from the context of the judge's entire comments at the probation-revocation hearing, the judge did not

believe respondent had reoffended but that he had engaged in behavior that called into question the effectiveness and progress of his counseling.

Respondent also argues the trial court erred by revoking his probation because the record established his slow but satisfactory progress toward treatment goals. We disagree.

One of the conditions of probation was successful completion of sex-offender treatment and counseling. As of December 20, 2007, Campbell believed respondent was making slow but satisfactory progress. However, after learning about the December 24, 2007, masturbation incident, Campbell concluded that counseling was not effective, terminated respondent's counseling, and recommended more intensive counseling in a secure setting.

Specifically, that incident called into doubt respondent's veracity in counseling, such as whether he was having sexual thoughts. Moreover, Campbell had taught respondent certain techniques to use to help avoid an incident such as had occurred. Respondent was not only unable to try to use any of the techniques he had been taught, but he was unable to identify his feelings before the incident in question. According to Campbell, if respondent could not identify the triggers, he would be unlikely to be able to use the techniques he was taught by Campbell.

Respondent cites In re G.L.C., 74 Ill. App. 3d 411, 393 N.E.2d 113 (1979), arguing the testimony at the hearing was insufficient to support revocation of probation. In G.L.C., the

respondent was ordered to report daily to his probation officer. G.L.C., 74 Ill. App. 3d at 412, 393 N.E.2d at 114. This court held that respondent's failure to report for three days between May 1978 and August 1978 was an insufficient basis to revoke his probation. G.L.C., 74 Ill. App. 3d at 413, 393 N.E.2d at 114 (also finding that the evidence showed the respondent was making progress with various services).

Recently courts have held that substantial compliance with a probation order is not sufficient and the failure to comply with one condition may be sufficient to revoke probation. See, e.g., People v. Bell, 219 Ill. App. 3d 264, 266, 579 N.E.2d 1154, 1156 (1991) (involving probation revocation for the failure to comply with the public-service-employment requirement, complete a drug-treatment program, and the willful failure to pay the probation fee). In any event, respondent's failure to make any progress during counseling is not the equivalent of missing three days of daily reporting to one's probation officer. Counseling was a substantial part--if not the most critical part--of respondent's probation. His failure to make progress--which included not taking his medication, not keeping a journal, being unable to express his feelings so that he could apply what he learned in counseling, being unable to identify the feelings that preceded the December 2007 masturbation incident, and being unable to apply the relapse-prevention techniques to try to avoid the December 2007 masturbation incident--resulted in Campbell terminating respondent's counseling. Therefore, respondent did

- 25 -

not complete sex-offender treatment and counseling and, based on Campbell's testimony, was unlikely to be able to do so in an outpatient setting. The trial court's conclusion that respondent violated a condition of probation was not against the manifest weight of the evidence. See, e.g., In re Jessie B., 327 Ill. App. 3d 1084, 1090, 765 N.E.2d 508, 513 (2002) (finding that the trial court's revocation of probation was not against the manifest weight of the evidence where the respondent failed to comply with and successfully complete the first phase of a three-phase program).

### B. Respondent Is Entitled to a New Dispositional Hearing Because the Trial Court's Personal Use of J-SOAP-II To Assess Respondent's Risk of Offending Improperly Tainted Respondent's Disposition

Respondent next argues the trial court erred by committing him to DOJJ where (1) the judge relied on her review and interpretation of judicial training material that she refused to make part of the record and (2) the disposition was against the manifest weight of the evidence and fatally tainted by the court's misuse of the J-SOAP-II materials that were not in the record. We agree.

At a sentencing hearing in a delinquency case, the trial court must determine whether it is in the best interests of the minor and the public that the minor be made a ward of the court. 705 ILCS 405/5-705(1) (West 2008). If so, the court must determine the "proper disposition best serving the interests of the minor and the public." 705 ILCS 405/5-705(1) (West 2008). In making that determination, the court may consider all helpful

- 26 -

evidence, including oral and written reports. 705 ILCS 405/5-705(1) (West 2008). A court may not order the minor committed to DOJJ until a written social-investigation report is completed and considered by the court. 705 ILCS 405/5-705(1) (West 2008). The trial court's decision following a dispositional hearing "will be reversed only if the findings of fact are against the manifest weight of the evidence or the court committed an abuse of discretion by selecting an inappropriate dispositional order." In re J.W., 386 Ill. App. 3d 847, 856, 898 N.E.2d 803, 811 (2008).

A trial court, when determining the appropriate disposition, may consider all helpful evidence, including oral and written reports. 705 ILCS 405/5-705(1) (West 2008). However, in this case, the J-SOAP-II manual was not made part of the record. The parties did not submit the J-SOAP-II manual as evidence. Dr. Appleton mentioned J-SOAP-II only in the context of wanting to readminister the test, and Campbell did not attach a copy of the manual to his April 2007 evaluation. Moreover, in his April 2007 evaluation, Campbell indicated that he administered J-SOAP-II, stated respondent's overall score of respondent's risk, and noted only those risk items he believed applied to respondent. The trial judge could not have been using Campbell's list because she read all 28 items from J-SOAP-II.

Nor did the trial court sufficiently make J-SOAP-II part of the record. The trial judge only read a brief portion of the description of the checklist.

This court can take judicial notice of the J-SOAP-II

- 27 -

manual, which is available from the United States Department of Justice's office of juvenile justice and delinquency prevention. See, e.g., <u>Dietz v. Property Tax Appeal Board</u>, 191 Ill. App. 3d 468, 477, 547 N.E.2d 1367, 1372 (1989) (taking judicial notice of the Illinois Real Property Appraisal Manual, which was issued by the Department of Revenue as a public record).  That manual provides that the "stakes are often very high" when assessing risk with juvenile offenders and that "[i]t is imperative that clinicians who assess the risk of adolescent offending be very knowledgeable of the challenges involved in assessing this population."  R. Prentky & S. Righthand, Juvenile Sex Offender Assessment Protocol-II (J-SOAP-II) Manual, at 1 (2003) (hereinafter R. Prentky & S. Righthand, J-SOAP-II Manual).  The manual further provides as follows:

> "Prior to using J-SOAP-II, users should have training and experience in assessing juveniles who commit sexual offenses and risk assessment in general, particularly as it pertains to juvenile sex offending.  In addition, prior to using J-SOAP-II, users should read the manual and be familiar with its contents.  Before using the scale in any professional capacity, users should complete several practice cases and compare their scores with others who have scored the same case to identify and resolve any scoring

difficulties.  It is also recommended that J-SOAP-II users periodically consult with each other about their scoring and stay current with the evolving literature relevant for assessing juveniles who sexually offend."  R. Prentky & S. Righthand, J-SOAP-II Manual, at 1.

"Decisions about reoffending should not be based exclusively on the results from J-SOAP-II.  J-SOAP-II should always be used as part of a comprehensive risk assessment."  R. Prentky & S. Righthand, J-SOAP-II Manual, at 1.

Here, the trial court's personal use of J-SOAP-II tainted respondent's disposition.  The court sua sponte, at the close of evidence, conducted her own risk assessment.  The use of tools like J-SOAP-II are important in determining an appropriate juvenile sentence.  Trial judges should be commended for participating in training relating to application and interpretation of juvenile testing methods so they can properly understand J-SOAP-II.  However, while courts should be familiar with J-SOAP-II, the actual assessment should be done by trained and knowledgeable clinicians.

The problem here is evidenced by at least two instances when the trial judge attempted to apply the checklist but considered factors not contained in the checklist.  For example, item 2 of the checklist pertains to the number of sexual-abuse victims and assigns a higher score for more victims.  R. Prentky & S.

Righthand, J-SOAP-II Manual, at 12. The court stated, "when the victims are family members, the J-SOAP indicates that is also to be taken into consideration and additional points awarded, as far as recidivism is concerned." However, J-SOAP-II manual does not make any reference to the status of the victim as a family member. Similarly, item 13, relating to juvenile antisocial behavior between ages 10 and 17, directs the assessor to score for the following:

> "nonsexual delinquent behavior such as (1) vandalism and destruction to property; (2) malicious mischief, disorderly conduct, vagrancy, habitual truancy; (3) fighting and physical violence; (4) owning or carrying a weapon (other than for sport and hunting); (5) theft, robbery, burglary; and (6) motor vehicle-related (reckless driving, operating to endanger, operating under the influence)."
> R. Prentky & S. Righthand, J-SOAP-II Manual, at 18.

However, when the trial judge discussed this item, she mentioned that respondent had friends but had some problems forming social relationships with peers.

In this case, the trial court's personal use of J-SOAP-II to assess respondent's risk of offending was improper and tainted respondent's dispositional hearing. Respondent is therefore entitled to a new dispositional hearing.

- 30 -

## III. CONCLUSION

For the reasons stated, we affirm the trial court's order revoking respondent's probation, reverse the court's dispositional order, and remand for a new dispositional hearing.

Affirmed in part and reversed in part; cause remanded.

TURNER, J., concurs.

POPE, J., concurs in part and dissents in part.

JUSTICE POPE, specially concurring in part and dissenting in part:

I concur in the portion of the majority's decision with respect to the trial court's use of J-SOAP-II. For the following reasons, I respectfully dissent from the majority's holding on the issue of the trial court's revocation of respondent's probation.

As the majority discusses, the State must prove a violation of probation by a preponderance of the evidence. Justin M.B., 204 Ill. 2d at 125, 787 N.E.2d at 826. The petition to revoke probation stated respondent failed to

> "complete or comply with sex[-]offender
> treatment, specifically within the past few
> weeks he was found to have possessed in his
> bedroom various sexual aids and devices and
> admitted to his therapist/counselor that he
> did not use any appropriate interventions to
> prevent himself from engaging in sexual be-
> havior as he had been taught to do through
> counseling and expressed to his counselor
> that he could not stop his need to engage in
> sexual behavior."

I would reverse the trial court's decision because, in essence, the petition alleged respondent violated his probation by engaging in masturbatory conduct. The evidence at the hearing established the revocation was based on this 15-year-old boy's

masturbatory conduct. His "sexual behavior" was with himself--not any third-party victim. Calling the minor's masturbation a failure to complete or comply with sex-offender treatment does not make it so.

The record supports the conclusion respondent was making slow but steady progress between April 2007 and January 2008. As the majority acknowledges, all parties, including the trial court, understood respondent's outpatient treatment would take a significant commitment of time and effort because of respondent's reduced intellectual capacity. Campbell even indicated to respondent's parents that respondent would be in treatment for the entire five years of probation. Thus, revocation of the minor's probation after only seven months, without any clear violations, reflects a lack of patience with respect to respondent's progress.

In his April 16, 2007, letter to the State, just one month after probation was imposed, Campbell wrote respondent "initially had trouble grasping the concepts of distorted thinking but is beginning to understand how he used it in his offenses. Treatment with this client will be slow and lengthy due not only to the content and to issues addressed, but also due to his limited intellectual capacity." Campbell acknowledged respondent's motivating factors for the abuse related to his parents' volatile relationship and "point in the direction of a power/control offense with elements of revenge rather than purely sexual urges to have sexual contact with younger children. ***

It may be a little more encouraging that the client needs to learn coping skills for stress and problem behaviors, rather than trying to change deviant sexual arousal patterns."

In the April 24, 2007, progress report from Campbell, he stated "[respondent] appears to be genuine in his desire for treatment. He is presently taking the antidepressant medication Zoloft which, he states, has significantly reduced the frequency of sexual thoughts. *** Treatment with this client will be slow and lengthy due not only to the content and to issues addressed, but also due to his limited intellectual capacity."

In the July 3, 2007, progress report, Campbell acknowledged the first masturbation incident when respondent's grandmother saw him masturbating through his open bedroom door, but Campbell did not expound on how he addressed the incident with respondent. Campbell states "[respondent] has identified some of the thinking errors that he used in his offense. He also identified depression as a trigger for his fantasies/offenses. *** Progress is slow but he seems committed to resolving his problems. He pays attention and stays on topic. No new issues or concerns."

At the August 1, 2007, hearing, the trial court stated, based on its review of Campbell's report, "[p]rogress is slow" and "not much progress" had been made. Speaking to respondent, the court said "why you would engage in [masturbation], in the viewing and presence of your grandmother, I really can't guess." As the majority acknowledges, the court posed the issue of

- 34 -

masturbation in terms of respondent engaging in the behavior in the presence of his grandmother, which could indicate to a 15-year-old male the behavior is acceptable in private.

Campbell states in his September 17, 2007, report "treatment has been focused on thinking errors. He seems to understand the concept and identify some of the thinking errors he used before, during, and after his offense. Also covered this quarter were anger management skills and identifying feelings. Progress has been satisfactory. He denies having *** had any deviant sexual thoughts during the quarter and there has been no evidence of any inappropriate sexual behaviors. *** No issues or concerns. Continue treatment." (Emphasis added.) While Campbell acknowledges no deviant sexual thoughts, he does not report on any healthy or appropriate sexual thoughts or behaviors. In October 2007, Campbell reported no violations.

In his November 27, 2007, letter to respondent's probation officer, Campbell states respondent is "in the process of developing his offense cycle so that he can map out the thoughts, feelings, and behaviors that led to his offending. *** [Respondent] remains cooperative with treatment except for journaling his feelings which he seems to avoid wanting to do. *** Overall, [respondent] is making satisfactory progress."

In his December 20, 2007, progress report, Campbell indicates respondent attended all sessions. Respondent had difficulty expressing feelings due to a couple of identifiable factors relating to the learned rule that real men do not express

- 35 -

feelings and his coping mechanism of numbing emotions.  Campbell indicates respondent has expressed negative emotions relating to how his father has treated him and his parents' ongoing conflicts.  Campbell states respondent is learning intervention techniques to "get out of his cycle."

Despite the petition specifically stating the masturbation incident was the reason for revocation, the majority and the trial court refer to respondent's failure to make progress in counseling as the grounds for the probation revocation.  At the revocation hearing, the court stated:

> "It's not just a matter that he masturbated
> when the doctor said that wasn't appropriate
> behavior at that point, but because they're
> not making any progress in therapy because he
> cannot, or will not, express his feelings and
> how these things came about.  That's why
> we're not making any progress in therapy.
> And so if the only *** offer [of] proof is
> *** to say that not masturbating or mastur-
> bating is or is not appropriate behavior
> under this kind of therapy situation, that
> doesn't go to the heart of this matter."

If, despite the language in the petition, the trial court's revocation was based on respondent's lack of progress instead of the masturbation incident, this finding is not supported by a preponderance of the evidence.  None of Campbell's

progress reports indicate treatment was not working, and Campbell consistently reported respondent made slow but steady progress.

The treatment plan implemented by Campbell lists the following goals: (1) client exhibits motivation for treatment, (2) client fully discloses and takes full responsibility for sexual offenses, (3) client identifies thinking errors, (4) client decreases arousal to deviant stimuli, (5) client identifies and understand offense cycle, (6) client develops relapse prevention plan, (7) client exhibits victim empathy, and (8) client's behavior in the community is positive. Respondent's treatment plan does not indicate ridding respondent of any sexual impulse or outlet is part of the treatment or an ultimate goal of the plan.

In accordance with the treatment goals, respondent (1) attended counseling sessions and, according to Campbell, exhibited a commitment to resolving his problems; (2) described the abuse he inflicted and consistently took responsibility for the abuse; (3) identified some of the thinking errors he used before, during, and after the offense; (4) decreased arousal to deviant stimuli, evidenced by his use of a primarily text-filled magazine that did not depict pictures of adults or children; (5) was learning how to "get out of his cycle" by incorporating intervention methods, which according to material provided by Campbell, included masturbation; (6) did not relapse in his deviant sexual behavior but used a relapse-prevention technique, masturbation, which is the subject of the revocation; (7) had not yet addressed

- 37 -

victim-empathy issues, which Campbell testified would be addressed later in treatment; and (8) exhibited positive behavior in the community evidenced by his appropriate behavior around peers and school staff and his participation in the Future Farmers of America, an extracurricular activity offered at his school. Numerically rating respondent's progress toward his treatment goals, Campbell increased respondent's ratings in the areas of decreasing arousal to deviant stimuli, identifying the offense cycle, and developing a relapse plan. Campbell did not lower respondent's rating for any of the eight goals.

If the masturbation incident was the basis for the trial court's decision, or even a factor in the court's decision, this too was improper, as no evidence was presented to show Campbell and the court prohibited respondent from masturbating as a term of his probation. In fact, the record does not indicate any effort by the court or Campbell to distinguish between healthy and deviant sexual thoughts and behaviors. On the contrary, Campbell testified that as of his December 20 status report, respondent was beginning the process of developing interventions to get out of the offense cycle. As part of the intervention therapy, Campbell provided respondent with reading material that specifically identified masturbation as an appropriate intervention technique. Additionally, only months prior to the revocation, the court indicated to respondent masturbation in front of his grandmother was inappropriate, leaving open to interpretation whether masturbating in private was an appropriate

outlet.

The trial court and Campbell placed a strong emphasis on respondent's failure to articulate precisely why he masturbated. Relying on a 15-year-old male's inability to explain the reasons he masturbated as a basis for revocation seems quite faulty. Respondent's intellectual limitations and difficulty expressing himself verbally would contribute to his difficulty in explaining the behavior. Campbell had previously indicated he allowed respondent to avoid the journaling exercise because he knew identifying and writing about his feelings was especially difficult for respondent. Campbell testified respondent "had a very difficult time expressing feelings. It took a lot of prompting on my part to get him to talk about his anger at his parents, for instance. And it was very difficult to get him to speak of feelings in any other context." Campbell went on to testify respondent's difficulty with communicating would apply to the feelings he experienced when he masturbated. Respondent presumably experienced some humiliation over being confronted by his parents for masturbating. In addition, his therapist asking him to explain why he masturbated could also contribute to his difficulty in discussing the incident.

At the revocation hearing, when asked if respondent's engaging in masturbation was normal, Campbell replied "it wouldn't be normal. The desire might continue to be normal, but the behavior would be prohibited. You know, the whole point of treatment was to help him learn to manage his behaviors and his

thoughts and his feelings that went before the behaviors."
Campbell's testimony and his reports illustrate a deficiency on
the issue of deviant versus healthy sexual behaviors. He does
not clarify whether "behavior" refers to the abuse or to any and
all sexual behavior. Campbell does not say he informed the
minor, as part of his counseling and treatment, that masturbation
was in fact prohibited. As Campbell pointed out in his April 16,
2007, letter to the State, respondent's abuse related to anger
and coping issues rather than a desire to molest children. If
treatment focused on eliminating deviant sexual thoughts and
preventing acting on those thoughts, and respondent had abstained
from deviant sexual behavior, the treatment was working.

At the same hearing, Campbell explained the letter he
sent to respondent's probation officer regarding the second
masturbation incident was not meant to indicate respondent was a
danger to others. Campbell testified "[t]here was no direct
evidence that he was a danger to others. There was no indication
he had been thinking about victimizing anyone or any indication
that he had thought about that, no." The State also asked
Campbell, "with regards to intervention techniques and relapse
prevention and distraction techniques, what does his engaging in
this kind of sexual behavior tell you about the success of his
treatment and how compliant he is with treatment?" Campbell
responded "it indicates to me that he was not able to manage his
behavior, his thoughts, feelings, or behaviors, and had not been
able to use any of those techniques or interventions that we had

talked about."  The State's witness seems to equate the 15-year-old minor's masturbation with noncompliance with treatment. However, by masturbating, respondent was engaging in an intervention technique, the use of which was an integral part of his treatment.  For this, his probation was revoked.

At the conclusion of the presentation of evidence at the revocation hearing, the trial court stated:

> "[h]ow does the counselor address these problems if [respondent] will not be honest and will not share this information in counseling?  And that's why it isn't successful. And that's why I find that the State has proved by a preponderance of the evidence that the minor has not followed his order of probation and his probation should be revoked."

The State's burden was to prove by a preponderance of the evidence the allegations in the petition to revoke.  Those allegations stated respondent violated his probation by masturbating. The trial court found respondent violated his probation by not being honest (in the court's opinion) and sharing information with his counselor, something entirely different than alleged in the petition.

In summary, regardless of how the trial court presented its reasons for revoking probation, it was in error because the preponderance of the evidence does not support the finding that

- 41 -

treatment was unsuccessful. Campbell continued with respondent's treatment for several months after the first masturbation episode, giving him satisfactory reports. Yet following the second episode, Campbell determined all of the treatment up to that point had failed and he would be starting from square one if he continued working with respondent. Masturbation was never clearly prohibited as part of his probation (nor do I suggest such a prohibition would have been appropriate), and Campbell apparently failed to distinguish between healthy and deviant sexual thoughts and behaviors.

Further, respondent consistently attended and participated in counseling, showed no signs of relapse or reoffending, and made positive progress toward his treatment goals. Nothing indicated he used any sexually deviant materials for arousal, and the apparent inconsistencies in Campbell's approach to treatment understandably left respondent believing masturbation in private might be an acceptable activity. Respondent demonstrated a below-average ability to verbalize or commit to writing his thoughts and feelings, but made an effort to communicate with Campbell, prompting Campbell to overlook respondent's failure to comply with the journaling exercise. Overall, respondent's case illustrates the slow and tedious road to rehabilitation posed by juvenile outpatient treatment. A review of the record makes clear the trial judge reluctantly agreed to the originally negotiated disposition of probation. This is understandable, given the serious nature of the minor's offenses. However, once

the minor was placed on probation, he attended school, had a good relationship with his school aide, attended all of his counseling sessions, and did not reoffend.  Viewing the evidence in the light most favorable to the State, I cannot find it proved, even by a preponderance of the evidence, the minor violated his probation.  Therefore, I respectfully dissent.